327 S.E.2d 683

**DUQUESNE LIGHT CO., et al.**

**v.**

**STATE TAX DEPT., etc., et al.**

**No. 16067.**

Supreme Court of Appeals of
West Virginia.

Nov. 14, 1984.

Concurring Opinion Dec. 3, 1984.

Certiorari Denied April 15, 1985.
See 105 S.Ct. 2040.

Robert E. Magnuson and William W. Booker, Love, Wise & Woodroe, Charleston, for appellees.

Chauncey H. Browning, Jr., Atty. Gen., and William F. Carroll, Deputy Atty. Gen., Charleston, for appellants.

MILLER, Justice:

The State Tax Commissioner appeals a decision of the Circuit Court of Kanawha County which struck down our business and occupation tax on the generation of electric power, W.Va.Code, 11–13–2m.[1] The court below held that this case was controlled by *Arizona Public Serv. Co. v. Snead*, 441 U.S. 141, 99 S.Ct. 1629, 60 L.Ed.2d 106 (1979), in which the United States Supreme Court struck down a New Mexico utility tax because it violated Section 2121(a) of the Tax Reform Act of 1976, 15 U.S.C. § 391 (1976). We disagree and reverse.

## I.

Before addressing the particular facts and issues raised in this case, it is important to understand the *Snead* case. The United States Supreme Court in *Snead* decided the case based upon 15 U.S.C. § 391,[2] which had been enacted because of a discriminatory tax adopted by the State of New Mexico. The purpose of 15 U.S.C. § 391 was set out in the Senate Finance Committee Report, which the United States Supreme Court quoted:

" 'The committee has learned that one State places a discriminatory tax upon the production of electricity within its boundaries for consumption outside its boundaries. While the rate of the tax itself is identical for electricity that is ultimately consumed outside the State and electricity which is consumed inside the State, discrimination results because the State allows the amount of the tax to be credited against its gross receipts tax if the electricity is consumed within its boundaries.' " 441 U.S. at 147, 99 S.Ct. at 1632–33, 60 L.Ed.2d at 111.

As the United States Supreme Court noted, the name of the state was not disclosed in the Committee Report, but during the floor debate, "Senators Domenici and Montoya of New Mexico, Senators Fannin and Goldwater of Arizona and Senator Cranston of California made it clear that the provision was aimed directly at New Mexico's electrical energy tax." 441 U.S. at 147, 99 S.Ct. at 1633, 60 L.Ed.2d at 112. Thus, the Supreme Court had before it a legislative enactment directed at a state statute that Congress had declared to be discriminatory.

A critical part of the Court's opinion was its determination that it would not adopt the Commerce Clause test for determining whether the state tax was discriminatory under 15 U.S.C. § 391. New Mexico urged this test since it "requires examination of New Mexico's total tax structure to deter-

---

1. The appellees are Duquesne Light Company, Ohio Power Company, West Penn Power Company, Appalachian Power Company, Monongahela Power Company, The Potomac Edison Company, and Virginia Electric and Power Company.

2. 15 U.S.C. § 391 provides:
"No State, or political subdivision thereof, may impose or assess a tax on or with respect to the generation or transmission of electrici-

ty which discriminates against out-of-State manufacturers, producers, wholesalers, retailers, or consumers of that electricity. For purposes of this section, a tax is discriminatory if it results, either directly or indirectly, in a greater tax burden on electricity which is generated and transmitted in interstate commerce than on electricity which is generated and transmitted in intrastate commerce."

mine whether the State in fact imposes a greater tax burden on electricity sent out of state. See *Halliburton Oil Well Cementing Co. v. Reily*, 373 US 64, 69 [83 S.Ct. 1201, 1203, 10 L.Ed.2d 202, 206 (1963) ]" 441 U.S. at 149, 99 S.Ct. at 1633–34, 60 L.Ed.2d at 113. New Mexico's central argument was that if the Court would examine the state's entire utility tax, it would be clear that the tax on utilities shipping energy out of state was not discriminatory.[3] However, the Court declined to look at the entire tax structure stating:

"To look narrowly to the type of tax the federal statute names, rather than to consider the entire tax structure of the State, is to be faithful not only to the language of that statute but also to the expressed intent of Congress in enacting it. Because the electrical energy tax *itself* indirectly but necessarily discriminates against electricity sold outside New Mexico, it violates the federal statute." 441 U.S. at 149–50, 99 S.Ct. at 1634, 60 L.Ed.2d at 113. (Emphasis in original; footnote omitted).

We observe that New Mexico's Electrical Energy Tax was enacted as a single tax enactment and not as part of a tax plan that affected related areas. Also of some importance is note 7 in *Snead*, 441 U.S. at 150, 99 S.Ct. at 1634, 60 L.Ed.2d at 113, where the Court stated:

"The *amici* in this case have pointed to several similar state taxes on the generation of electricity. Pa.Stat.Ann., Tit. 72, § 8101 (Purdon Supp. 1978–1979); Wash. Rev.Code §§ 82.16.020, 82.16.050 (1976); W.Va.Code §§ 11–13–2d, 11–13–2m (Supp.1978). None of these States, however, has adopted precisely the scheme used by New Mexico, and we express no

opinion as to the validity of these or any other state tax laws."

With these salient points from *Snead* in mind, we proceed to discuss our tax.

## II.

W.Va.Code, 11–13–2m, was enacted in 1978 as a part of a larger plan to reorganize the business and occupation tax on utilities.[4] Prior to 1978, electric utilities generating or selling electricity in this State were taxed under W.Va.Code, 11–13–2d, at the rate of 5.72 percent based on sales and demand charges for domestic purposes and 4.29 percent on sales and demand charges for all other purposes.[5] Electric utilities generating electricity in this State but transmitting it out of state were taxed under the general manufacturing tax rate under W.Va.Code, 11–13–2b, which was 0.88 percent. *See Virginia Elec. and Power Co. v. Haden*, 157 W.Va. 298, 200 S.E.2d 848 (1973), *cert. denied*, 416 U.S. 916, 94 S.Ct. 1624, 40 L.Ed.2d 118 (1974).

As applicable to this case, the material changes made by the 1978 amendments to W.Va.Code, 11–13–1, *et seq.*, were as follows. The taxation on manufacturing of electricity was removed from W.Va.Code, 11–13–2b, and placed in a new section, W.Va.Code, 11–13–2m. This section provides that the tax rate would be 4 percent, subject to a provision that the rate would be 2.46 percent on electricity sold to a customer engaged in manufacturing if the contract demand exceeded 200,000 kilowatts per hour per year, or if the usage exceeded 200,000 kilowatts per hour in a year.[6]

---

**3.** The United States Supreme Court summarized New Mexico's argument as follows:

"Power sold within New Mexico, they argue, is subject to a 4% tax: 2% from the electrical energy tax and 2% from the gross receipts tax. By contrast, New Mexico subjects electricity sent out of state only to its 2% generation tax. The appellees contend, therefore, that if there is any discrimination in New Mexico's taxing structure, it is discrimination against electricity consumed within the State." 441 U.S. at 149, 99 S.Ct. at 1634, 60 L.Ed.2d at 113.

**4.** *See* 1978 W.Va. Acts ch. 96.

**5.** W.Va.Code, 11–13–2d, excepted "income received by municipally owned plants producing or purchasing electricity and distributing same." This exception for municipally owned electric utilities was continued in the 1978 amendments. W.Va.Code, 11–13–2d (1978).

**6.** W.Va.Code, 11–13–2m, provides:

"(1) Upon every person engaging or continuing within this State in the business of generating or producing electric power for sale, profit or commercial use, either directly or through the activity of others, in whole or

The 1978 amendments also altered W.Va. Code, 11–13–2d, to provide that electric utilities generating electricity for sale in this State would be taxed at a 4 percent rate, and those which do not generate electricity but supply it are to be taxed at a 3 percent rate. A proviso similar to the one in Section 2m was placed in this section to provide for a reduced rate of 2.46 percent if a manufacturing customer's contract demand exceeded 200,000 kilowatts per hour per year or if the usage exceeded 200,000 kilowatts per hour per year.[7]

It is quite clear that the 1978 amendments harmonized the tax rate between the generation and sale in this State of electric power and the generation of electric power in this State for transmission out of state. It is true that there is some difference in language between Sections 2d and 2m with regard to measuring the value of the product, i.e., electric power.[8] However, W.Va. Code, 11–13–2, was also amended in 1978 to bring equality to the measurement of the value between Sections 2d and 2m taxes:

"If any person liable for any tax under sections two-a, two-l or two-m [§§ 11–13–2a, 11–13–2l or 11–13–2m] shall ship or transport his products or any part thereof out of the state without making sale of such products, the value of the products in the condition or form in which they exist immediately before transportation out of the state shall be the basis for the assessment of the tax imposed in said section, except in those instances in which another measure of the tax is expressly provided. The tax commissioner shall prescribe equitable and uniform rules for ascertaining such value."[9]

in part, when the sale thereof is not subject to tax under section two-d [§ 11–13–2d] of this article, the amount of the tax to be equal to the value of the electric power, as shown by the gross proceeds derived from the sale thereof by the generator or producer of the same multiplied by a rate of four percent, except that the rate shall be two and forty-six hundredths percent on that portion of the gross proceeds derived from the sale of electric power to a plant location of a customer engaged in a manufacturing activity, if the contract demand at such plant location exceeds two hundred thousand kilowatts per hour per year, or if the usage at such plant location exceeds two hundred thousand kilowatts per hour in a year.

"(2) The measure of this tax shall be the value of all electric power generated or produced in this State for sale, profit or commercial use, regardless of the place of sale or the fact that transmission may be to points outside this State: Provided, that the gross income received by municipally owned plants generating or producing electricity shall not be subject to tax under this article."

7. The relevant portion of W.Va.Code, 11–13–2d, states:

"Upon any person engaging or continuing within this State in any public service or utility business ... there is likewise hereby levied and shall be collected taxes on account of the business engaged in equal to gross income of the business multiplied by the respective rates as follows: ... electric light and power companies, four percent on sales and demand charges for domestic purposes and commercial lighting and four percent on sales and demand charges for all other purposes ...: Provided, that electric light and power compa-nies which engage in the supplying of public service but which do not generate or produce electric power shall be taxed on the gross income derived therefrom at the rate of three percent on sales and demand charges for domestic purposes and commercial lighting and three percent on sales and demand charges for all other purposes ...: Provided, however, that the sale of electric power under this section shall be taxed at the rate of two and forty-six hundredths percent on that portion of the gross proceeds derived from the sale of electric power to a plant location of a customer engaged in a manufacturing activity, if the contract demand at such plant location exceeds two hundred thousand kilowatts per hour per year, or if the usage at such plant location exceeds two hundred thousand kilowatts per hour in a year .... The measure of this tax shall not include gross income derived from commerce between this State and other states of the United States or between this State and foreign countries. The measure of the tax under this section shall include only gross income received from the supplying of public services. The gross income of the taxpayer from any other activity shall be included in the measure of the tax imposed upon the appropriate section or sections of this article."

8. W.Va.Code, 11–13–2d, uses the term "gross income" from "sales and demand charges"; and W.Va.Code, 11–13–2m, uses the term "gross proceeds derived from the sale thereof."

9. The parties agree that the State Tax Commissioner has by a written memorandum with the appellees adopted a uniform formula for ascertaining the value of electricity under Section

## III.

With this background in mind, we address the issue in this case: does W.Va. Code, 11–13–2m, violate 15 U.S.C. § 391? The circuit court did not elaborate on its holding. The principal argument advanced by the utilities is that Section 2m must be read in isolation. When it is, it is patently discriminatory under *Snead* because it taxes only the manufacturing of electricity which is transmitted out of state, and excludes in-state manufacturing by its reference to Section 2d.

We are cited several cases in which we have held that our business and occupation tax is composed of a number of separate taxes which are applicable to various distinct business activities. *E.g., Virginia Elec. and Power Co. v. Haden, supra; United Fuel Gas Co. v. Battle,* 153 W.Va. 222, 167 S.E.2d 890, *appeal dismissed sub nom. United Fuel Gas Co. v. Haden,* 396 U.S. 116, 90 S.Ct. 398, 24 L.Ed.2d 309 (1969); *Owens-Illinois Glass Co. v. Battle,* 151 W.Va. 655, 154 S.E.2d 854 (1967). Based upon these cases, the argument is made that each section of the business and occupation tax must stand scrutiny separately.

We have not, however, adopted such a rigid view of our business and occupation tax structure. For example, in *Owens-Illinois Glass Co. v. Battle,* we utilized the doctrine of *in pari materia* to settle a question under our business and occupation tax by construing several related provisions.

■ Moreover, we cannot ignore the fact that the 1978 amendments did more than enact Section 2m. As we have previously stated, several sections of the business and occupation tax which dealt with the manufacturing of electricity were amended. Un-der well known canons of statutory construction, we are obliged to consider a legislative enactment in its entirety. *Woodring v. Whyte,* 161 W.Va. 262, 242 S.E.2d 238 (1978); *Spencer v. Yearce,* 155 W.Va. 54, 180 S.E.2d 868 (1971); Syllabus Point 1, *State ex rel. Holbert v. Robinson,* 134 W.Va. 524, 59 S.E.2d 884 (1950).

If we consider the 1978 amendments in their entirety, it is apparent that the legislature did not single out and tax only the manufacturing of electricity that is transmitted out of state. Under Section 2d, the manufacturing of electricity that is used in this State is also taxed at the same rate.

Our situation is entirely different from what existed in *Snead* where New Mexico had enacted a single tax statute directed at manufacturing electricity which was transmitted out of state. As noted in our analysis of the *Snead* decision, the Court refused to go beyond the confines of the statute to determine from the total framework of New Mexico's tax scheme if the particular tax was in fact discriminatory.

In the present case, the 1978 amendments embody both Sections 2d and 2m. It is clear that both sections tax the business of generating electric power at the same rates. It is also clear that Section 2d deals with in-state generation and sale while Section 2m relates only to in-state generation or manufacture which is transmitted out of state. We find no discrimination between Sections 2d and 2m.

The fundamental fallacy of the appellees' argument is that they would have us limit our analysis to Section 2m, as if the legislative amendments in 1978 involved only this section.[10] We cannot, however, ignore the other sections contained in the 1978 amend-

---

2m, which is known as the VEPCO formula. Under this formula, value is essentially the cost of generation at the place of manufacture plus an allowed rate of return. (Appellees' brief, pp. 6–7). The Tax Commissioner argues, and we agree, that with the tax rates being the same, this valuation or measurement yields a lower tax on electric power transmitted out of state, because the measurement of value for electricity generated and sold in this State includes not only the cost of manufacturing and a reasonable rate of return, but the cost of transporting it to the customer (poles, lines, transformers, etc.) as well.

**10.** This was also the mistake in the student analysis on which the trial court relied in part. *See* Note, *West Virginia's Generation of Electricity Tax: Is It Valid After Snead?,* 83 W.Va.L.Rev. 79 (1981).

ments dealing with the manufacture of electrical power.[11]

■ Consequently, we hold that Section 2m of the 1978 Acts of the Legislature, Chapter 96, does not violate the provisions of 15 U.S.C. § 391, as interpreted by the United States Supreme Court in the case of *Arizona Public Serv. Co. v. Snead,* 441 U.S. 141, 99 S.Ct. 1629, 60 L.Ed.2d 106 (1979), and the Circuit Court of Kanawha County erred in holding that it did.

## IV.

■ Although both parties have briefed the question of whether the statute violates the Commerce and Equal Protection Clauses of the United States Constitution, as well as the Equal and Uniform Taxation Provision of the West Virginia Constitution, we decline to address these issues because they were not passed upon by the circuit court. We have traditionally held, as indicated in Syllabus Point 2 of *Sands v. Security Trust Co.,* 143 W.Va. 522, 102 S.E.2d 733 (1958), that:

"This Court will not pass on a nonjurisdictional question which has not been decided by the trial court in the first instance."

*See also West Virginia Dept. of Highways v. Delta Concrete Co.,* W.Va., 268 S.E.2d 124 (1980); *Dixon v. American Indus. Leasing Co.,* 157 W.Va. 735, 205 S.E.2d 4 (1974); Syllabus Point 1, *Pettry v. Chesapeake and O. Ry. Co.,* 148 W.Va. 443, 135 S.E.2d 729 (1964).

Because we have found the circuit court in error in its application of *Snead,* we reverse the judgment and remand the case in order that it may consider the other grounds asserted by the appellees in their complaint.

Reversed and Remanded.

NEELY, Justice, concurring:[1]

I concur to mention some additional distinctions between our business and occupation tax structure and the electrical energy tax that was held invalid in *Arizona Public Service Co. v. Snead,* 441 U.S. 141, 99 S.Ct. 1620, 60 L.Ed.2d 106 (1979). Under the taxing scheme enacted by the State of New Mexico, a producer of electricity in New Mexico who sold the electricity out-of-state paid a 2 percent tax that would not have been collected if the electricity had been sold in New Mexico. In effect, then, New Mexico taxed separately the production of electric power for export.

Under New Mexico law distributors of electrical energy were liable to payment of a gross receipts tax of 4 percent.[2] This tax, enacted in 1953, was not related to electricity generation; the utility would have paid the same 4 percent if it had been a door-to-door distributor of bubble gum.[3]

When the New Mexico electrical energy tax[4] was imposed, the statute gave credit for the electrical energy tax against the New Mexico gross receipts tax—a credit that could be used only by in-state, New Mexico producers/distributors. Thus, although New Mexico was entitled to tax the production of electrical energy, it failed to

---

11. *See, i.e.,* W.Va.Code, 11–13–2, –2b, –2d and –2m.

1. Originally I noted a possible dissent in this case because it appeared that the West Virginia situation was controlled by *Arizona Public Service v. Snead, infra.* But as I methodically worked through the New Mexico and West Virginia tax schemes, my dissent became a concurrence. I now agree with the majority's opinion and add this concurrence only to explain my own reasoning in the hope that I might save work for others.

2. NMSA 7–9–1 to 7–9–81 [1978] sets out New Mexico's general excise tax.

3. The tax imposed on the New Mexico electric utilities was a general excise tax that applied in

equal measure to all other businesses within the State. That section, NMSA 7–9–4 [1983], in its present incarnation reads: "A. For the privilege of engaging in business, an excise tax equal to three and three-fourths percent of gross receipts is imposed on any person engaging in business in New Mexico. B. The tax imposed by this section shall be referred to as the 'gross receipts tax.'"

4. NMSA 7–18–1 to 7–18–6 [1978]. New Mexico's electrical energy tax, repealed in 1982, related to the imposition and rate of tax on the generation of electricity and required reports or remittances of persons subject to the tax.

tax both the domestic and foreign producers equally because New Mexico, in effect, refunded the tax to domestic producers through a tax credit that applied to an entirely unrelated tax. That is the difference between *pre-Snead* New Mexico and today's West Virginia. What if New Mexico had given compensating credits against domestic producers' turnpike tolls or had given them a credit toward the New Mexico vehicle licenses of power company trucks? These examples make clear that the electrical energy tax and its compensating credit for in-state producers explicitly discriminated against interstate commerce.

West Virginia does not refund the electricity generation tax to domestic producers; West Virginia taxes domestic producers more heavily because they *do* more in West Virginia. But at first blush West Virginia's scheme appears similar to New Mexico's scheme because we have one subsection of the *West Virginia Code* that applies to foreign producers and another that applies to domestic producers. Our tax for both domestic and foreign producers, however, is calculated on exactly the same basis, namely on the value of electricity manufactured, transmitted, and distributed.

The structure of *W. Va. Code*, 11–13–2d [1978] and 11–13–2m [1978] discloses that West Virginia taxes all the electrical utilities equally along a continuum that starts with manufacture of the power and ends with its delivery to the consumer. New Mexico's tax was levied *only* upon electricity *manufactured;* the credit, however, was against gross domestic *sales.* In evaluating the applicability of *Snead, supra,* to the West Virginia business and occupation tax it is important to point out that the New Mexico tax gave credit for one type of tax—an electrical energy tax—against another type of tax, namely a sales tax.

In state statutes that affect interstate commerce, words of art or characterizations can be more significant than in almost any other area of law. Phrases such as "privilege of doing business" or "general excise" can make or break a state statute. The Supreme Court has held that such "magic words or labels" cannot validate an otherwise invalid tax, but may be capable of disabling "an otherwise constitutional levy." *Railway Express Agency v. Virginia,* 358 U.S. 434, at 441, 79 S.Ct. 411, at 416, 3 L.Ed.2d 450 (1959).

Under the Supreme Court's recent view of state taxation of interstate commerce, a state tax on the "privilege of doing business" is not *per se* unconstitutional in the absence of a claim "that the activity is not sufficiently connected to the State to justify a tax, or that the tax is not fairly related to benefits provided the taxpayers, or that the tax discriminates against interstate commerce, or that the tax is not fairly apportioned." *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, at 287, 97 S.Ct. 1076, 1083, 51 L.Ed.2d 326 (1977), *reh. den.* 430 U.S. 976, 97 S.Ct. 1669, 52 L.Ed.2d 371 (1977). Accordingly, West Virginia's business and occupation tax passes constitutional muster. The entire process of providing electricity to the ultimate consumer is taxed. If the whole process goes on in West Virginia, then West Virginia taxes manufacture, transmission, and distribution. But if only manufacture occurs in West Virginia, West Virginia taxes only manufacture. Thus the tax is fairly apportioned and violates neither the *Constitution of the United States* or 15 U.S.C. § 391 (1976).

In order to understand the legality, under *Snead, supra,* of West Virginia's business and occupation tax structure as applied to out-of-state utilities one must look for a moment at the nature of the electric utility business. Approximately 90.8 percent of the value of electrical energy at the point of consumption is attributable to the *cost of manufacture.* For example, if we study the 1983 Annual Report of the Appalachian Power Company we find that its production of power (manufacture) expenses were $495,741,691 while its bulk transmission costs were only $15,981,809 and its cost of low voltage distribution to consumers was only $41,147,842. Consequently, the biggest overall activity in the electric utility business is manufacture.

The only reason that West Virginia taxes generation of power for out-of-state con-

sumption under *W. Va. Code*, 11–13–2m [1978] and generation for in-state consumption under *W. Va. Code*, 11–13–2d [1978] is so that out-of-state producers will *not* pay tax on the value of transmission and distribution activities. The tax for in-state consumption is higher than the tax on out-of-state consumption because West Virginia also taxes transmission and distribution for in-state producers. Under the West Virginia business and occupation tax statutes everything that an electric utility does in the State of West Virginia—whether a foreign or domestic producer—is taxed at 4 percent. Manufacturers of electrical energy for sale inside West Virginia are treated exactly as manufacturers of electrical energy for sale outside of West Virginia.

For our purposes here it is important to point out that West Virginia makes no effort to exempt in-state producers and distributors from the burden of the tax on electrical energy production. This lack of discrimination is made possible because West Virginia has always had a business and occupation tax on the public utility business. New Mexico ran afoul of 15 U.S.C. § 391 (1976) because, for all intents and purposes, New Mexico taxed out-of-state producers on the basis of generation and in-state producers on the basis of gross receipts (sales). Since New Mexico relied upon a gross receipts (sales) tax to raise revenue from producers of electricity *in New Mexico* it had no choice but to enact a subsequent special electrical energy tax to capture revenue from utilities generating power in New Mexico to be *sold outside* of New Mexico. Without New Mexico's 2 percent tax credit against the gross receipts tax, New Mexico consumers would have had their rates increased by 2 percent.

What New Mexico did was entirely logical, but also probably unconstitutional; at least we know that it was against the subsequently enacted 15 U.S.C. § 391 (1976). In New Mexico's case the substance of the tax was reasonable but the form was unconstitutional. The Supreme Court's overruling of *Spector Motor Service v. O'Connor*, 340 U.S. 602, 71 S.Ct. 508, 95 S.Ct. 573 (1951) in *Complete Auto Transit Inc. v. Brady, supra,* implies that triumphs of

form over substance are no longer fashionable in determining whether a tax is a burden on interstate commerce. At some point, however, form becomes substance: it is a fine line, but it was crossed by New Mexico. Under *Complete Auto, supra,* West Virginia is on the constitutional side of the line as well as being within 15 U.S.C. § 391 (1976).

It may appear initially that the distinction between New Mexico's 2 percent credit for the electrical energy tax against the New Mexico gross receipts tax *versus* West Virginia's exemption from the operation of *W. Va. Code*, 11–13–2m [1978] for local utilities paying tax under *W. Va. Code*, 11–13–2d [1978] is a distinction without a difference. But nothing could be further from the truth: there is a difference and that difference relates to the fact that West Virginia producers and distributors of electricity are not exempt from the burden of *W. Va. Code*, 11–13–2m [1978] but, rather, are subjected to exactly the same burden plus the *additional* tax on transmission and distribution provided in *W. Va. Code*, 11–13–2d [1978]. If, indeed, we had imposed a special tax on the generation of electric power and then given West Virginia producers/distributors of power a credit against an entirely unrelated sales tax we would be within the purview of *Arizona Public Service Co. v. Snead, supra.* But we didn't!