350 S.E.2d 754

**DUQUESNE LIGHT COMPANY, et al.,**

v.

**STATE TAX DEPARTMENT, et al.**

**No. 17219.**

Supreme Court of Appeals of
West Virginia.

Nov. 20, 1986.

Love, Wise & Woodroe, Robert E. Nag-
nuson, William W. Booker, Charleston, for
appellants.

Charles G. Brown, Atty. Gen., William F.
Carroll, Mary Carol Holbert, Asst. Attys.
Gen., for appellees.

NEELY, Justice:

West Virginia imposes a business and
occupation tax upon the privilege of manu-
facturing, transmitting, and distributing
electric power. *W. Va. Code*, 11–13–2d
[1978] taxes electricity generated *and dis-
tributed* in West Virginia at the rate of 4
percent, based upon the final sales and
demand charges to the consumer. *W. Va.
Code*, 11–13–2m [1978] taxes electricity
generated in this State for distribution out-
side West Virginia at the rate of 4 percent
based upon the gross sales price.[1] Appel-
lants are electric power companies who
manufacture electricity in West Virginia
for distribution outside of West Virginia.
They sued for a declaratory judgment in

---

1. *W. Va. Code* 11–13–2d [1978] and *W. Va. Code*
11–13–2m [1978] are set forth in their entirety
in the appendix to this opinion. The different
language used in 2d and 2m, namely a 2d tax on
"final sales and demand charges" and a 2m tax

on "gross sales price" proceeds from the fact
that West Virginia taxes both manufacture and
distribution if both occur in-state, but measures
the tax by only the value of the power as it
leaves West Virginia when power is exported.

the Circuit Court of Kanawha County on the grounds that West Virginia's 2m tax on domestically produced electricity sold in other states discriminates against interstate commerce.

This case was originally before us in 1984. *Duquesne Light Company v. State Tax Department,* 174 W.Va. 506, 327 S.E.2d 683 (1984), *cert. denied,* 471 U.S. 1029, 105 S.Ct. 2040, 85 L.Ed.2d 322 (1985). In that proceeding we addressed only the question of whether the tax imposed by *Code* 11–13–2m [1978] violates 15 U.S.C. § 391, as interpreted by the Supreme Court in *Arizona Public Service Company v. Snead,* 441 U.S. 141, 99 S.Ct. 1629, 60 L.Ed.2d 106 (1979).[2] We held then that the West Virginia tax imposed by Section 2m does not violate 15 U.S.C. § 391 as interpreted by the Supreme Court in *Snead.* The Supreme Court declined to grant *certiorari* in that case, and although the appellants again urge us to consider 15 U.S.C. § 391 and *Snead,* we stand by our earlier opinion.

However, in the first *Duquesne* case we did not address appellants' general commerce clause objections to West Virginia's 2m tax because the circuit court had held the tax invalid under 15 U.S.C. § 391 and *Snead.* When we reversed the circuit court in the first *Duquesne* case we remanded the case for further development of the commerce clause issues. The circuit court then decided the commerce clause issues against the power companies and they now appeal. The gravamen of their complaint in the lower court and here is that *Code* 11–13–2m [1978] is a specific tax on the privilege of producing electric power for transmission out-of-state and, therefore, discriminates against interstate commerce in violation of the U.S. *Constitution's* commerce clause.

Indeed, if *Code* 11–13–2m were the only provision taxing the manufacture of electricity we would agree; however, *Code* 11–13–2m is but one part of a comprehensive, non-discriminatory, fairly apportioned business and occupation tax. For commerce clause purposes, it is substance and not form that determines a tax's validity. *Complete Auto Transit, Inc., v. Brady,* 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). Consequently, we affirm the circuit court.

I

■ In order to appreciate the validity of West Virginia's 2m tax on the generation of electricity for sale out-of-state, it is necessary to look synoptically at *Code* 11–13–2m [1978] *and Code* 11–13–2d [1978]. Taken together, these two sections tax all electric utilities equally along a continuum that begins with the manufacture of power and ends with its delivery to the consumer. Under the Supreme Court's view of state taxation of interstate commerce, a state tax on "the privilege of doing business" is not *per se* unconstitutional in the absence of a claim "that the activity is not sufficiently connected to the state to justify a tax, or that the tax is not fairly related to the benefits provided the taxpayers, or that the tax discriminates against interstate commerce, or that the tax is not fairly apportioned." *Complete Auto Transit, Inc., supra.*

■ Under West Virginia's 2d and 2m taxes the entire process of providing electricity to consumers is taxed, but *only* to the extent that production or distribution occurs in West Virginia. If the whole process from the generation of power to its distribution goes on in West Virginia, then West Virginia taxes manufacture, transmission, and distribution under section 2d. But if only manufacture occurs in West Virginia, West Virginia taxes only manufacture under 2m. Thus the tax is fairly apportioned.[3]

Producers of electricity for distribution inside West Virginia pay a tax of 4 percent

---

**2.** 15 U.S.C. § 391 simply prohibits a state or political subdivision from imposing on the generation or transmission of electricity a tax that discriminates against out-of-state users.

**3.** The appellants also assert that because *Code* 11–13–2d [1978] exempts municipally owned

power companies from the payment of the 4 percent utility tax and reduces the tax to 2.46 percent for sales to manufacturing plants purchasing two hundred thousand kilowatts per hour per year there is a violation of *W.Va. Const.* art X, § 1 and the U.S. *Constitution's*

on the gross proceeds at the point of final sale. That means that producers of electricity for domestic purposes pay a unified tax under 2d that can be broken down into 4 percent on the value of manufacture, 4 percent on the value of transmission, and 4 percent on the value of distribution. Producers of electricity for out-of-state distribution pay only a 4 percent tax under 2m on the value of manufacture. The reason that West Virginia taxes generation of power for out-of-state consumption under Section 2m and generation for in-state consumption under Section 2d is so that out-of-state producers will *not* pay tax on the value of transmission and distribution activities. The tax on utilities producing for in-state consumption is higher than the tax on utilities producing for out-of-state consumption because West Virginia taxes transmission and distribution activities only if they occur in this State.

As the foregoing discussion demonstrates, Section 2d is a tax on the *manufacture*, transmission and distribution of electric power for public utility sale in West Virginia. Because both Section 2d and Section 2m tax the manufacture of electric power, appellants' contention that the two sections do not tax "substantially equivalent events," *Armco Inc., v. Hardesty*, 467 U.S. 638, 104 S.Ct. 2620, 81 L.Ed.2d 540 (1984), must fail.[4]

■ Appellant's primary contention that West Virginia's 2m tax is a specific tax on the privilege of engaging in interstate commerce is entirely without merit. The mere fact that it is easier from the point of view of statutory draftsmanship to create a comprehensive, fairly-apportioned tax structure through the use of separate code sections does not, in and of itself, convert what is in

equal protection clause. We find these arguments without merit.

Initially it should be noted that *Code* 11–12–2m [1978] allows the exact exemptions for municipally owned plants selling electricity out-of-state and to utilities supplying out-of-state, high usage manufacturers that are accorded domestic utilities under 2d. Consequently, a power plant in West Virginia selling electricity directly to an out-of-state manufacturer using two hundred thousand kilowatts per hour per year would be taxed the same as an in-state producer/distributor.

*W.Va. Const.* art. X, § 1 and the U.S. *Constitution's* equal protection clause express similar principles. Although persons in like circumstances must be taxed alike, it is the prerogative of the legislature to classify persons in unlike circumstances and to tax different classes differently. The test of the validity of legislative classifications is whether there is a "rational relationship" between the classification and a valid public purpose. *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); applied specifically in a tax context in *U.S. v. Maryland Savings-Share Insurance Corp.*, 400 U.S. 4, 91 S.Ct. 16, 27 L.Ed.2d 4 (1970). Certainly there is a valid public purpose in distinguishing between ordinary consumers and large commercial users of electricity who provide thousands of jobs in West Virginia or, although located out-of-state, are buying West Virginia power, and can move their plants to locations where their energy needs will not be met by West Virginia power. Furthermore, it is legitimate for the state government to decline to tax the activities of another governmental entity, namely municipally owned power plants. Because it has been conclusively determined

that providing power to consumers is a legitimate governmental function, *Puget Sound Power & Light Co. v. Seattle*, 291 U.S. 619, 54 S.Ct. 542, 78 L.Ed. 1025 (1934), there is no equal protection problem when government declines to tax itself or another government entity. *Tennessee Power Co. v. T.V.A.*, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939).

4. In *Armco*, the Supreme Court held that a tax of 0.88 percent imposed upon in-state manufacturing could not be deemed a compensatory tax for a 0.27 percent tax on wholesale sales imposed only on out-of-state manufacturers, because manufacturing and wholesale sales were not "substantially equivalent events." In so holding, the Court relied upon the lack of a wholesale sales tax component in the manufacturing tax. The Court stated at 467 U.S. 643:

> The fact that the manufacturing tax is not reduced when a West Virginia manufacturer sells its goods out-of-state, and that it is reduced when part of the manufacturing takes place out-of-state, makes clear that the manufacturing tax is just that, and not in part a proxy for the gross receipts tax imposed on Armco and other sellers from other States.

In *Armco*, the manufacturing tax was not a compensatory tax for the wholesale sales tax because the manufacturing tax contained no demonstrable wholesale sales tax component. In this case, Section 2d *does* contain a demonstrable manufacturing tax (Section 2m) component. The Section 2d tax is imposed on the final sales and demand charges to the consumer, which charges reflect the costs not only of transmission and distribution, but also those of manufacture.

fact a single tax on all manufacturers of electricity into a constitutionally invalid tax on the privilege of engaging in interstate commerce. *Spector Motor Service v. O'Connor*, 340 U.S. 602, 71 S.Ct. 508, 95 L.Ed. 573 (1951), which was the high water mark of the triumph of form over substance in interstate commerce tax cases, was overruled by *Complete Auto, supra,* on the specific grounds that in interstate tax cases form should not prevail over substance.

## II

West Virginia's overall taxing scheme for producers and distributors of electricity also meets the "mirror image test" announced in *Armco Inc., v. Hardesty, supra,* where the Supreme Court said:

> In *Container Corp. of America v. Franchise Tax Board,* 463 U.S. [159], [169], 103 S.Ct. 2933, 2942, 77 L.Ed.2d 545 (1983), the Court noted that a tax must have "what might be called internal consistency—that is the [tax] must be such that, if applied by every jurisdiction," there would be no impermissible interference with free trade.

467 U.S. at 644, 104 S.Ct. at 2624. For purposes of Armco's "mirror image" test, it should be noted that Section 2d has a proviso that reduces the electric utility tax from 4 percent to 3 percent on sales and demand charges for domestic purposes when the electricity is produced out-of-state and then imported into West Virginia. The purpose of this reduction is to provide fair tax apportionment when production takes place outside West Virginia but transmission and distribution take place inside West Virginia.[5]

A West Virginia distributor of electric power produced out-of-state might quibble about the precision of the one percent allowance. But as the Supreme Court has said on numerous occasions ... "we will strike down the application of an apportionment formula if the taxpayer can prove 'by clear and cogent evidence' that the income attributed to the State is in fact 'out of all appropriate proportions to the business transacted ... in that State' or has 'led to a grossly distorted result.'" *Container Corp. of America v. Franchise Tax Bd.* 463 U.S. 159, 160, 103 S.Ct. 2933, 2937, 77 L.Ed.2d 545 (1983). *See also Norfolk & Western R. Co. v. State Tax Comm'n,* 390 U.S. 317, 326, 88 S.Ct. 995, 1001, 19 L.Ed.2d 1201 (1968); *Moorman Mfg. Co. v. Bair,* 437 U.S. 267, 274, 98 S.Ct. 2340, 2345, 57 L.Ed.2d 197 (1978). In oral argument before this Court, appellants' counsel was reluctant to stipulate the exact proportion that production cost bears to total cost. Conceivably that was because such a stipulation for tax purposes here might then be binding in future rate submissions before the Public Service Commission.

A company challenging a state's apportionment of business activity has a heavy burden of proving by "clear and cogent" evidence that the apportionment is grossly and flagrantly excessive. *Railway Express Agency v. Virginia,* 347 U.S. 359, 74 S.Ct. 558, 98 L.Ed. 757 (1954). The appellants' position in the lower court was grounded exclusively in tax theory—namely, that West Virginia cannot lawfully impose a separate tax on electrical energy generated for export. Although a company that is paying a 3 percent gross receipts tax on imported power has standing to quarrel with West Virginia's apportionment in that regard, it was stipulated in oral argument that a negligible percentage of all of West Virginia's total power is imported. Thus the precision of the one percent credit for foreign taxes for imported power is largely academic and, in any event, awaits a litigant with standing to challenge it and sufficient interest to develop a detailed factual record.[6]

## III

In *Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 101 S.Ct. 2946, 69

---

5. None of the appellants argues that part of its business involves the sale in West Virginia of power generated out-of-state and, therefore, no factual record was developed below concerning the proportion that generation bears to total cost for out-of-state producers distributing here.

6. One specific example might illuminate the type of factual problem presented by appellants' general allegations that section 2d's 1 percent credit for imported power flunks *Armco's* "mirror image" test. Were we to assume that the cost of manufacturing electricity out-of-state is

L.Ed.2d 884 (1981), the Supreme Court held in circumstances analogous to this case that Montana's coal severance tax is not unconstitutional simply because 80 percent of Montana's coal is shipped out-of-state. Under *Commonwealth Edison*, the test of a tax's constitutional validity is not whether the tax burden falls on out-of-state residents, but whether there is discrimination between interstate and intrastate commerce. Because there is absolutely no discrimination in West Virginia's tax structure, *Commonwealth Edison* is dispositive of the issues in this case.

■ The act of manufacturing electricity in West Virginia involves the use by the manufacturer of numerous facilities and services provided by the State. For example, a power plant's employees' dependents are educated in the public schools; ingress and egress to the plant is provided by public roads; the plant is protected by West Virginia's state and local police; the company uses our courts; and, the company's employees are protected under West Virginia's workers' compensation and unemployment insurance. Certainly the *Complete Auto, supra*, requirement that state taxes be fairly related to the services provided is met in the case before us. State services are the same whether power produced here is consumed in West Virginia or elsewhere.

As *Commonwealth Edison, supra*, indicates, the fact that a burdensome industry is established to service the export market does not relieve that industry of its fair share of properly apportioned state taxes.

Accordingly, for the reasons set forth above the judgment of the Circuit Court of Kanawha County is affirmed.

Affirmed.

## APPENDIX

*W.Va.Code* 11–13–2d [1978] says in its entirety:

11–13–2d. Public service or utility business.

Upon any person engaging or continuing within this State in any public service or utility business, except railroad, railroad car, express, pipeline, telephone and telegraph companies, water carriers by steamboat or steamship and motor carriers, there is likewise hereby levied and shall be collected taxes on account of the business engaged in equal to gross income of the business multiplied by the respective rates as follows: Street and interurban and electric railways, one and four-tenths percent; water companies, four and four-tenths percent, except as to income received by municipally owned water plants; electric light and power companies, four percent on sales and demand charges for domestic purposes and

25 percent of the cost of that electricity at the point of sale in this State, we find that if every other state had exactly our *Code* 11–13–2d and 2m taxes, there would be perfect symmetry between interstate and intrastate commerce. On a hypothetical $100 of electricity produced and distributed in West Virginia a 2d tax of $4.00 measured by 4 percent of the sales price at the consumer's meter would be paid to West Virginia. On a hypothetical $100 worth of electricity imported from a foreign state with exactly our tax structure, a 4 percent 2m tax on the value of production would be paid to the foreign state— in this case 4 percent of $25, or $1. West Virginia would then collect a 3 percent, 2d tax on the value of the power delivered to the customer's meter—in this case 3 percent of $100, or $3—which when added to the foreign state's 2m tax would amount to a total tax for both states combined of $4.

Of course, because the issue was not developed below, we cannot determine whether our hypothetical 25 percent of cost attributable to production approximates reality. If it does not,

under our own state law of remedies, namely the "doctrine of the least intrusive remedy," the appropriate course is to challenge the validity of the legislature's approximation of the appropriate credit to be allowed for imported power. (*Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984) acknowledges the authority of state courts operating under state law to craft appropriate remedies for constitutional imperfections in state tax schemes). Once proving by clear, cogent and convincing evidence, *Railway Express, supra, in text*, that the cost of imported power amounts to substantially more than 25 percent of the cost of power delivered at the customer's meter, a company with standing can ask this court to increase the 2d credit—something that West Virginia's doctrine of the least intrusive remedy allows us to do. *See generally Mauck v. City of Martinsburg*, 167 W.Va. 332 at 337, 280 S.E.2d 216 at 220; *See* specifically in this context, *Hartstock-Flesher Candy v. Wheeling Wholesale*, 174 W.Va. 538 at 545, footnote 10, 328 S.E.2d 144 at 151, footnote 10 (1984).

commercial lighting and four percent on sales and demand charges for all other purposes, except as to income received by municipally owned plants producing or purchasing electricity and distributing same: Provided, that electric light and power companies which engage in the supplying of public service but which do not generate or produce electric power shall be taxed on the gross income derived therefrom at the rate of three percent on sales and demand charges for domestic purposes and commercial lighting and three percent on sales and demand charges for all other purposes, except as to income received by municipally owned plants: Provided, however, that the sale of electric power under this section shall be taxed at the rate of two and forty-six hundredths percent on that portion of the gross proceeds derived from the sale of electric power to a plant location of a customer engaged in a manufacturing activity, if the contract demand at such plant location exceeds two hundred thousand kilowatts per hour per year, or if the usage at such plant location exceeds two hundred thousand kilowatts per hour in a year; natural gas companies, four and twenty-nine hundredths percent on the gross income; toll bridge companies, four and twenty-nine hundredths percent; and upon all other public service or utility business, two and eighty-six hundredths percent. The measure of this tax shall not include gross income derived from commerce between this State and other states of the United States or between this State and foreign countries. The measure of the tax under this section shall include only gross income received from the supplying of public services. The gross income of the taxpayer from any other activity shall be included in the measure of the tax imposed upon the appropriate section or sections of this article. (1935, c. 86; 1955, c. 165; 1959, c. 167; 1971, c. 169; 1978, c. 96.)

*W. Va. Code* 11–13–2m [1978] says in its entirety:

11–13–2m. Business of generating or producing electric power; exception; rates.

(1) Upon every person engaging or continuing within this State in the business of generating or producing electric power for sale, profit or commercial use, either directly or through the activity of others, in whole or in part, when the sale thereof is not subject to tax under section two-d [§ 11–13–2d] of this article, the amount of the tax to be equal to the value of the electric power, as shown by the gross proceeds derived from the sale thereof by the generator or producer of the same multiplied by a rate of four percent, except that the rate shall be two and forty-six hundredths percent on that portion of the gross proceeds derived from the sale of electric power to a plant location of a customer engaged in a manufacturing activity, if the contract demand at such plant location exceeds two hundred thousand kilowatts per hour per year, or if the usage at such plant location exceeds two hundred thousand kilowatts per hour in a year.

(2) The measure of this tax shall be the value of all electric power generated or produced in this State for sale, profit or commercial use, regardless of the place of sale or the fact that transmission may be to points outside this State: Provided, that the gross income received by municipally owned plants generating or producing electricity shall not be subject to tax under this article. (1978, c. 96.)