671 S.E.2d 740

William T. SMOOT, II, by His Next Friend, Kari Smoot, Plaintiff Below, Appellant,

v.

AMERICAN ELECTRIC POWER, Verizon of West Virginia, Inc. and Charter Communications, Inc., Defendants Below, Appellees.

No. 33806.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 28, 2008.

Decided Nov. 12, 2008.

Cynthia M. Ranson, J. Michael Ranson, Ranson Law Offices, Charleston, for Appellant.

Mark H. Hayes, Robinson & McElwee, Ronda L. Harvey, Bowles Rice McDavid Graff & Love, Michelle Roman Fox, Martin & Seibert, Charleston, for Appellees.

PER CURIAM:[1]

█ The appellant, William T. Smoot, II, by his next friend, Kari Major[2] (hereinafter collectively referred to as "Mr. Smoot"), filed this appeal from an order of the Circuit Court of Kanawha County granting summary judgment to the appellees, American Electric Power, Verizon of West Virginia, Inc., and Charter Communications, Inc.[3] Here, Mr. Smoot contends that the circuit court erred in finding, as a matter of law, that the defendants did not owe him a legal duty to place guy markers on three guy wires[4] that anchored a utility pole.[5] It is also contended by Mr. Smoot that the circuit court committed error in finding that, (1) at the time of his injury, he was a trespasser, and, to the extent that the defendants owed him a duty, (2) there was no evidence that the defendants engaged in willful and wanton conduct that caused him injury.[6] After a careful review of the briefs and record, and considering the oral arguments of the parties, the circuit court's summary judgment order is reversed and this case is remanded for further proceeding consistent with this opinion.

## I.

## FACTUAL AND PROCEDURAL HISTORY

Shortly before 8:00 p.m. on August 12, 2003, Mr. Smoot, who was thirteen years old at the time, was riding his bicycle along Embassy Drive in Cross Lanes, West Virginia.[7] According to Mr. Smoot, as he "approached a left-hand curve in the road, [he] was unable to negotiate the curve due to mud flying into his eye." Consequently, Mr. Smoot veered his bicycle off the road and down a slope on property owned by Anna Farley. He traveled approximately nineteen feet down the slope and crashed into three guy wires that were owned by the defendants. As a result of the accident, Mr. Smoot sustained a severe injury to his right

---

1. Pursuant to an administrative order entered on September 11, 2008, the Honorable Thomas E. McHugh, Senior Status Justice, was assigned to sit as a member of the Supreme Court of Appeals of West Virginia commencing September 12, 2008, and continuing until the Chief Justice determines that assistance is no longer necessary, in light of the illness of Justice Joseph P. Albright.

2. Kari Major is the mother of Mr. Smoot.

3. The defendants filed a joint appellate brief.

4. Guy markers are elongated plastic or metal devices that are placed on guy wires (cables) so that the location of the guy wires are more readily visible.

5. The utility pole carried utility lines that were used by each defendant.

6. Mr. Smoot's brief also addresses the issue of whether or not he was contributorily negligent. However, that issue was not addressed in the circuit court's order. Consequently, this issue is not properly before this Court. *See* Syl. pt. 2, *Duquesne Light Co. v. State Tax Dep't.*, 174 W.Va. 506, 327 S.E.2d 683 (1984) (" 'This Court will not pass on a nonjurisdictional question which has not been decided by the trial court in the first instance.' Syllabus Point 2, *Sands v. Security Trust Co.*, 143 W.Va. 522, 102 S.E.2d 733 (1958).").

7. Mr. Smoot was accompanied by his five-year-old brother and three friends, all of whom were riding on separate bicycles.

lower leg.[8]

On May 4, 2004, Mr. Smoot filed the instant action against the defendants. In his complaint Mr. Smoot contended "[t]hat because the defendants did not have any of the guy wires marked [, he] was unable to see that he was riding straight for the guy wires until it was too late to avoid coming into contact with said wires." After a period of extensive discovery, the defendants moved for summary judgment. On February 22, 2007, the circuit court granted summary judgment in favor of the defendants.

The circuit court's summary judgment decision was based upon two mutually exclusive grounds. First, the circuit court found that, based upon the industry standard for utility pole guy wires, as set out in the National Electrical Safety Code, the defendants were not required to place guy markers on the guy wires because the guy wires were not "exposed" to pedestrian traffic. As a result of there being no requirement under industry standards to place guy markers on the guy wires, the "[d]efendants did not owe [Mr.] Smoot a duty to mark or guard the guy wires at issue." Second, the circuit court found that Mr. Smoot was trespassing when the accident occurred. Consequently, if a duty had been owed to Mr. Smoot by the defendants, the circuit court determined that Mr. Smoot had to produce evidence to show that the defendants' breach of that duty was willful and wanton. The circuit court found that no evidence was produced to suggest that Mr. Smoot's injury occurred as a result of willful and wanton conduct by the defendants. Following the entry of the circuit court's summary judgment, Mr. Smoot filed this appeal.

## II.

### STANDARD OF REVIEW

■ This matter comes to us from an order of the circuit court granting summary judgment in favor of the defendants. We have held that "[a] circuit court's entry of summary judgment is reviewed *de novo*." Syl. pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). In undertaking a *de novo* review, we apply the same standard for granting summary judgment that is applied by the circuit court. Under that standard "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. pt. 3, *Aetna Cas. & Sur. Co. v. Federal Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963). Moreover,

> [s]ummary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove.

Syl. pt. 4, *Painter*, 192 W.Va. 189, 451 S.E.2d 755. Finally, we are also cognizant that "[t]he circuit court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but is to determine whether there is a genuine issue for trial." Syl. pt. 3, *Painter, id.* With these applicable standards in view, we now consider the substantive issues raised herein.

## III.

### DISCUSSION

#### A. The Defendants Owed Mr. Smoot a Duty to Place Guy Markers on the Guy Wires

■ The first issue we address in this appeal is whether the circuit court was correct in finding that the defendants did not owe Mr. Smoot a duty to place guy markers on the guy wires. We have long held that, "[i]n order to establish a prima facie case of negligence in West Virginia, it must be shown that the defendant has been guilty of some act or omission in violation of a duty owed to the plaintiff. No action for negligence will lie without a duty broken." Syl.

---

8. While not relevant to our decision on the merits of this appeal, we note that the defendants have suggested that "[i]t is just as plausible that Mr. Smoot's severely broken leg was caused by him crashing to the ground after he hit [a] rock barrier, at a high rate of speed, and was flung into the air."

pt. 1, *Parsley v. General Motors Acceptance Corp.*, 167 W.Va. 866, 280 S.E.2d 703 (1981). We pointed out in Syllabus point 3 of *Sewell v. Gregory*, 179 W.Va. 585, 371 S.E.2d 82 (1988), that

[t]he ultimate test of the existence of a duty to use care is found in the foreseeability that harm may result if it is not exercised. The test is, would the ordinary man in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result?

Moreover,

[t]he determination of whether a defendant in a particular case owes a duty to the plaintiff is not a factual question for the jury; rather the determination of whether a plaintiff is owed a duty of care by a defendant must be rendered by the court as a matter of law.

Syl. pt. 5, *Aikens v. Debow*, 208 W.Va. 486, 541 S.E.2d 576 (2000).

 In the instant case, the defendants argue that they complied with the standard for using guy markers on guy wires, as the same is set out in the 2002 edition of the National Electrical Safety Code (hereinafter referred to as "NESC").[9] Consequently, the defendants assert that they did not owe a duty to Mr. Smoot to place guy markers on the guy wires in question.[10] The provision of NESC relied upon by the defendants, Section 264E(1), states:

The ground end of anchor guys *exposed to pedestrian traffic* shall be provided with a substantial and conspicuous marker.

(Emphasis added)[11] (Footnote added). The circuit court found that "the guy wires at issue are open and obvious and not exposed to pedestrian traffic. Thus, NESC does not

require that the guy wires in question be marked or guarded." For the reasons fully set out below, we disagree with the circuit court.

 The parties in this case agree that NESC has been adopted by reference under regulations promulgated by the Public Service Commission of West Virginia. *See* W. Va.C.S.R. § 150–3–5.1.2 (2000) ("[T]he Commission will take as a guide the current edition of the National Electrical Safety Code[.]"). This Court has had occasion to address the application of standards set by NESC:

Valid rules and regulations of the Public Service Commission of West Virginia, which incorporate and adopt certain minimum requirements of the National [Electrical] Safety Code with regard to the external installation of electrical equipment, have the force of statutory law and the failure to comply therewith would constitute prima facie negligence. The compliance therewith would meet the standard of care and duty required in such cases unless other circumstances appear which would require additional care in order to comply with the requirement to use ordinary care in attendant circumstances.

Syl. pt. 1, *Johnson v. Monongahela Power Co.*, 146 W.Va. 900, 123 S.E.2d 81 (1961). Contrary to the contention of the defendants, it is clear that, under *Johnson*, proof of compliance with a safety standard set out by NESC *does not* insulate a defendant from liability, if a given set of facts demonstrates that a higher standard should be applied. *See Lambert v. Franklin Real Estate Co.*, 37 S.W.3d 770, 778 (Ky.Ct.App.2000)("[A]n electric company's compliance with safety standards does not in itself free the company of negligence.").[12] We need not determine

---

9. The standards set out in NESC were established by the Institute of Electrical and Electronic Engineers, a nonprofit organization.

10. The parties presented conflicting expert testimony as to whether the guy wires were required to have guy markers.

11. This provision is now set out in Section 217C(1) of the 2007 edition of NESC.

12. The reason for permitting exceptions to industry standards, like those created by NESC, has been stated as follows:

The duty of care is an objective standard determined by what an ordinary careful and prudent person would have done under the same or similar circumstances. Industry customs or standards do not establish a legal standard of care. Were we to permit industry standards to establish the legal standard of care, we would also permit industry to dictate

whether the facts of this case required a higher standard than that which is imposed by Section 264E(1) of NESC. In our review of the record submitted to the circuit court, we find that Mr. Smoot presented sufficient evidence to show that the standard established under Section 264E(1) of NESC required the defendants to place guy markers on the guy wires at issue. A case which helps illustrate our conclusion is *Musch v. H–D Electric Cooperative, Inc.*, 460 N.W.2d 149 (S.D.1990).

In *Musch*, the plaintiff rode her horse onto the property of Alfred and Beverly Novy, to retrieve a stray calf. When the plaintiff entered the Novys' property, "[j]ust a few horse strides off the county road, the calf veered in a northerly direction under an unguarded guy wire. [The plaintiff] never saw the guy wire and was violently knocked off her horse." *Musch*, 460 N.W.2d at 150. The plaintiff filed a lawsuit against the defendant power company that owned the guy wire and utility pole that it anchored. The trial court granted summary judgment to the defendant on the grounds that the plaintiff was a trespasser on the property. The Supreme Court of South Dakota reversed after finding that the defendant could not assert a trespassing defense to real property that it did not own. In making this ruling, the *Musch* court addressed the defendant's claim that it was not required to place a guy marker on the guy wire. *Musch* stated, under applicable federal regulations pertaining to agricultural land, "[g]uy guards, or better termed guy markers, must be used on guyed transmission structures exposed to pedestrian traffic." *Musch*, 460 N.W.2d at 151. The court in *Musch* found that the plaintiff presented evidence that a guy marker was required to be placed on the guy wire:

> Here, [the defendant's] pole and guy wire were near a county road. Their own guidelines suggested that guy wires be marked if in fields exposed to vehicular traffic and pedestrians. Though [the defendant] claims [the plaintiff] presented no evidence of these facts, the record does not support this allegation. Alfred Novy testi-

fied concerning the pole's proximity to his garden and his mowing around the pole three or four times a year. The rough diagram entered into evidence by [the plaintiff] demonstrates the proximity of the pole and the guy wire to the road and traffic.

*Musch*, 460 N.W.2d at 154. In sum, the court in *Musch* found that the guy wire was exposed to traffic because it was located (1) "a few horse strides off" the road, (2) near a garden, and (3) near a lawn that was mowed and maintained.

In the instant proceeding, both parties have presented clear photo images of the area in which the guy wires were located. The photo images reveal a utility pole near the edge of Embassy Drive. Right next to the utility pole is a mailbox, newspaper box, and gas meter. A flower garden runs immediately along the roadway near the utility pole. The flower garden is partitioned on one side, closest to the road, by garden stones, and, on the other side, by garden planks. The land begins to slope down from the garden planks, where the guy wires are located, approximately nineteen feet from the edge of the roadway. The picture shows that a lawn surrounds the guy wires and that the lawn was cut and maintained.

It is clear from the photo images presented to this Court, and to the trial court, that the guy wires are *exposed to pedestrian traffic.* This is evident by the fact that a mail box, newspaper box, gas meter, and flower garden are near the guy wires. Further, insofar as no evidence to the contrary has been presented, the lawn immediately around the guy wires is mowed and maintained. We are not concerned with the defendants' emphasis on the fact that the guy wires are approximately nineteen feet from the roadway. As noted in *Musch*, the guy wires are merely "a few horse strides off" the road.

Additionally, the defendants argue that the evidence establishes only that the guy wires may be "accessible" to pedestrian traffic, but that the evidence does not show that the guy wires are "exposed" to pedestrian traffic. In other words, the defendants contend that

---

the terms under which its members could be held liable for negligence.

*Pierce v. Platte–Clay Elec. Coop., Inc.*, 769 S.W.2d 769, 772 (Mo.1989).

there is a distinction between the meaning of "accessible" and "exposed to," and that the standard established by NESC does not include mere accessibility to pedestrian traffic. We find this argument unpersuasive.

NESC does not provide a definition for "exposed". Therefore, we must afford the term its common, ordinary meaning. This Court has previously held that " '[i]n the absence of any definition of the intended meaning of words or terms used in a [regulation], they will ... be given their common, ordinary and accepted meaning in the connection in which they are used.' " *Subcarrier Communications, Inc. v. Nield*, 218 W.Va. 292, 300, 624 S.E.2d 729, 737 (2005) (quoting Syl. pt. 1, *Miners in Gen. Group v. Hix*, 123 W.Va. 637, 17 S.E.2d 810 (1941), *overruled on other grounds by Lee–Norse Co. v. Rutledge*, 170 W.Va. 162, 291 S.E.2d 477 (1982)). In the context in which the term is used in Section 264E(1) of NESC, the common and ordinary meaning of "expose" is defined as "to submit or make accessible to a particular action or influence." Merriam–Webster's Collegiate Dictionary 441 (11th ed.2005). *See State v. Daub*, No. 56621-1-I, 2007 WL 738805 at*2 (Wash.Ct.App. Mar. 12, 2007) (per curiam) (" 'Exposed' is not defined in the statute, but means made accessible to something that may prove detrimental."). Thus, contrary to the position of the defendants, by definition, the term "exposed" actually refers to and encompasses the term "accessible." Further, insofar as there is nothing in NESC which suggests a distinction should be made between the terms "exposed" and "accessible," we will not impose any such distinction.

The defendants also attempt to rely upon the decision in *Phelps v. Wisconsin Telephone Co.*, 244 Wis. 57, 11 N.W.2d 667 (1943). However, *Phelps* is clearly distinguishable. In *Phelps*, the plaintiff's husband, while driving a road grader, turned around in an area where the road had terminated. In so doing, plaintiff's husband accidentally backed into a guy wire which crushed him against the steering wheel and killed him. The plaintiff filed a lawsuit against the defendant, a utility company that owned the guy wire. A verdict was returned in favor of the plaintiff. The defendant appealed. The controlling issue in

the appeal was whether or not the defendant was required to place a guy marker on the guy wire. Under applicable law, the defendant was required to place a guy marker only on guy wires that were exposed to traffic.

The court in *Phelps* found that because the utility pole that was anchored by the guy wire was located in an area where the road had ended, the guy wire was not exposed to vehicular traffic. The court in *Phelps* rejected evidence showing that occasionally people drove past the utility pole and guy wire:

There is no evidence which in our judgment would warrant the jury in concluding that there ever was any public travel on North 117th Street south of the guy pole. One or two witnesses testified that some cars had proceeded south past the pole and guy wire. Most of this evidence relates to cars that proceeded south along 117th Street, found that the street did not go through, turned around in the vicinity of the guy wire or even south of that, and occasionally got mired in the process. However, this showing of sporadic and occasional use south of the pole by persons operating under the mistaken assumption that the road led some place is not a showing that there was public travel on this highway and it is even further from a showing that the guy wire, which under any construction of the evidence was not in or immediately adjacent to a traveled part of the highway itself, was exposed to traffic, as that term is used in the safety order. That the wire was so exposed is sought to be shown by the same evidence. We are not impressed with the claim that this testimony is significant. Had cars been driven further south beyond the thornapple bush where nobody claims that there was any highway, the driver could not by this process expose this territory to traffic or constitute poles or other structures in that vicinity obstructions or inconveniences to public travel. Neither can this be done so far as the boulevard is concerned. There is some evidence that a footpath existed about three feet to the east of the pole and that children used this as a short cut to school. This does not establish that the guy wire is exposed to pedestrian traf-

fic and if it did, it would not have any tendency to indicate that it was exposed to vehicular traffic.

*Phelps,* 11 N.W.2d at 669–70.

We do not find *Phelps* persuasive. It was exclusively concerned with whether a guy wire was exposed to vehicular traffic. Moreover, *Phelps* made clear that even if evidence could be mounted to show that the area was exposed to pedestrian traffic, this showing would not establish that the area also was exposed to vehicular traffic. In contrast, the issue presented to this Court, as framed by the parties and the trial court, is whether the guy wires were exposed to pedestrian traffic, not vehicular traffic.[13] Consequently, we find that the circuit court erred in holding that the defendants did not owe Mr. Smoot a duty to place guy markers on the guy wires pursuant to Section 264E(1) of NESC.

### B. The Defendants Cannot Rely on the Defense of Trespass

The final alternative ground relied upon by the circuit court is that Mr. Smoot was a trespasser. Therefore, to the extent that the defendants owed him a duty, there was no evidence that the defendants engaged in willful and wanton conduct that caused him injury. *See* Syl. pt. 2, *Huffman v. Appalachian Power Co.,* 187 W.Va. 1, 415 S.E.2d 145 (1991) ("The owner or possessor of property does not owe trespassers a duty of ordinary care. With regard to a trespasser, a possessor of property only need refrain from wilful or wanton injury."). We need not linger on this issue. This Court previously held in *Sutton v. Monongahela Power Co.,* 151 W.Va. 961, 158 S.E.2d 98 (1967), that utility companies could not rely upon the defense of trespass on real property in which they only had a right of way. In Syllabus point 3 of *Sutton* we held:

Even though a child is a trespasser on the property of a third party, he is not a trespasser as to one who maintains electric wires either on or in such proximity to the lands of the third person that the child while on such lands or objects on such lands may come in contact with the wires.

*Id.*

The defendants contend that *Sutton* only prevents a utility company from raising a landowner's defense of trespass when the issue involves electrical wires. Insofar as the issue in this case involves guy wires, which do not carry electricity, the defendants argue that *Sutton's* prohibition has no application. Defendants read *Sutton* too narrowly. It is wholly illogical for the law to legitimately hold that a utility company cannot raise a landowner's trespass defense, when it involves an electrical wire that runs across a utility pole, but then hold that such a defense may be raised as to a guy wire that is also connected to the exact same utility pole.[14] Consequently, insofar as the defendants have acknowledged that they did not own the land upon which Mr. Smoot allegedly trespassed, as it was owned by Anna Farley, the decision in *Sutton* precluded the trial court from permitting the defendants to rely upon the defense of trespass on Anna Farley's land. In light of the decision in *Sutton,* we find that it was error for the trial court to allow the defendants to assert the defense of trespass to land that they did not own.

## IV.

## CONCLUSION

The circuit court's order granting summary judgment in favor of the defendants is

---

13. We recognize that Mr. Smoot was riding a bicycle when he allegedly hit the guy wires. This fact is of no moment because the issue was litigated and decided based upon the regulation as it pertained to pedestrian traffic.

14. Of course, if a person, without a right to do so, climbed onto a high voltage transmission tower, came in contact with an electrical wire, and was injured, our decision in *Huffman v. Appalachian Power Co.,* 187 W.Va. 1, 415 S.E.2d 145 (1991), would permit the utility company to raise the defense of trespass, even though the company did not own the land upon which the transmission tower stood. In this situation, *Huffman* recognizes a trespass in climbing the transmission tower, not in being on the land where the tower stood. To be clear, in the instant case, the issue is not that of trespassing on the guy wires, *i.e.,* coming in contact with them. The circuit court applied the trespass doctrine because Mr. Smoot "was trespassing on Anna Farley's property."

reversed, and this case is remanded for further proceedings consistent with this opinion.

Reversed and Remanded.