# IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

Spring 2024 Term

_____

No. 22-ICA-164

_____

FILED

**January 30, 2024**

**released at 3:00 p.m.**
C. CASEY FORBES, CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

IPI, INC. AND MATTHEW JOSEPH TAYLOR,
Plaintiffs Below, Petitioners,

v.

AXIALL CORPORATION and EAGLE NATRIUM, LLC,
Defendants Below, Respondents.

_____

Appeal from the Circuit Court of Marshall County
Honorable Jeffrey D. Cramer, Judge
Civil Action No. 18-C-14

AFFIRMED IN PART, VACATED IN PART, AND REMANDED
_____

Submitted: September 21, 2023
Filed: January 30, 2024

Peter G. Markham, Esq.
Patrick C. Timony, Esq.
Zachary J. Rosencrance, Esq.
J. Tyler Barton, Esq.
Bowles Rice LLP
Charleston, West Virginia
Counsel for Petitioners

William D. Wilmoth, Esq.
Steptoe & Johnson, PLLC
Wheeling, West Virginia

John R. Callcott, Esq.
Steptoe & Johnson, PLLC
Morgantown, West Virginia
Counsel for Respondents

CHIEF JUDGE SCARR delivered the Opinion of the Court.

SCARR, CHIEF JUDGE:

Petitioners IPI, Inc. ("IPI") and Matthew J. Taylor appeal the September 12, 2022, order from the Circuit Court of Marshall County that granted respondents' motion for partial summary judgment on their counterclaims for indemnity and breach of contract. In its order, the circuit court found that, pursuant to Pennsylvania law, the indemnity provisions within the parties' contract applied to claims petitioners brought against the respondents related to a chlorine gas leak at respondents' facility. For the reasons mentioned below, this Court affirms in part, and vacates in part, the September 12, 2022, order from the Circuit Court of Marshall County, and remands this matter to the lower court with directions for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

IPI is a small contracting company based in Elkview, West Virginia, that provides industrial painting and power washing services to businesses throughout West Virginia. Mr. Taylor is IPI's president and routinely works hands-on at many of IPI's jobsites. Respondent Eagle Natrium, LLC ("Eagle Natrium") is the owner and operator of a large chemical plant where the chlorine leak at issue occurred. Respondent Axiall Corporation ("Axiall") is the parent corporation of Eagle Natrium through a series of

1

intermediaries. Prior to the leak at issue on this appeal, the parties had maintained a long-term commercial relationship.[1]

On August 27, 2016, IPI and Mr. Taylor were onsite at respondents' chemical plant in Natrium, West Virginia, performing power washing and painting services on a large chemical storage tank. Contemporaneously, but unrelated to IPI's services, in another part of the plant, respondents were attempting to load hundreds of thousands of pounds of chlorine gas into a 1979 railcar for transport. This railcar utilized a subframe that the Federal Railroad Administration had advised in 2006 was prone to defects such as tank head cracks, pad-to-tank cracks, sill web cracks, and tank shell buckling that in some instances led to release of hazardous materials. The loading was occurring hundreds of feet away in an entirely different department within the plant than where IPI was working. This loading was not related to, part of, or required for IPI to perform its work. There is no dispute that IPI had no control over the area where the railcar was being loaded, that none of its employees were involved in the loading, and that it had no involvement in the maintenance or usage of the railcar.

---

[1] IPI performed several contracts at the plant between 2007 when it signed an Agreement for On-Site Services ("AOS") with PPG Industries, Inc. ("PPG"), the original owner of the plant, and 2016 when the leak occurred. Axiall and Eagle Natrium acquired the facility in 2013.

The subject railcar had recently been returned to service after lengthy repairs necessitated by extensive corrosion, which had been performed by outside contractors. The railcar had a crack near the inboard end of the stub sill cradle pad, and when it was filled with chlorine gas, the crack widened and the tank ruptured, releasing 178,400 pounds of toxic chlorine gas throughout the plant, some of which drifted into the area where Mr. Taylor and two IPI employees were working on forty-foot platforms. According to Mr. Taylor, he did not hear any emergency alarms or sirens when the leak occurred. He first became aware of the leak when he noticed a large green cloud coming toward him. He put his escape respirator in his mouth but removed it long enough to yell for his employees to apply their own respirators. In the process, Mr. Taylor inhaled chlorine gas. It is alleged that Mr. Taylor and his employees attempted to escape the area, but were impeded by a locked gate, resulting in more prolonged exposure to the leak.[2]

Due to his chlorine exposure, Mr. Taylor reported to the plant's onsite medical clinic before being transferred by ambulance to a local hospital. There, the treating physician determined the effects of Mr. Taylor's chlorine exposure could not be adequately treated at the hospital, and Mr. Taylor was then life-flighted to a larger hospital for further

---

[2] Although the litigation in the lower court involved two separate leaks of chlorine gas which occurred on different days, this appeal is limited to the August 27, 2016, chlorine leak. Also, while two summary judgment orders were attached to the notice of appeal, to wit: the orders of September 8, 2022, and September 12, 2022, the only order currently on appeal is the September 12, 2022, order, which granted summary judgment in favor of respondents on their counterclaims for indemnity. *See* Petitioners' Brief at 1 n. 1 and 11.

3

evaluation and treatment. In addition to Mr. Taylor's personal injuries, it was alleged that the first leak damaged hundreds of thousands of dollars' worth of IPI equipment.

At the time of the August 2016 leak, IPI's work at the plant was subject to two separate indemnity provisions. First, there was an indemnity paragraph in an Agreement for On-Site Services ("AOS") that IPI signed in 2007, prior to Axiall's acquisition of the plant.[3] Second, there was an indemnity paragraph in the General Terms and Conditions ("Terms and Conditions") that were incorporated by reference in each Purchase Order ("PO").

Section 4 of the AOS contains the following indemnification provision:

> [IPI] assumes the risk of all damages, losses, costs and expenses, and agrees to indemnify, defend and hold harmless [Axiall and Eagle Natrium], their directors, officers, agents, and employees **from and against any and all claims, liability, damage, loss, penalties, fines, cost and expense of any kind** whatsoever which may accrue to or be sustained by [Axiall and Eagle Natrium], their directors, officers, agents or employees, **arising out of this Agreement and/or the Services**, including, without limitation, for the death of or injury to persons or destruction of property involving [IPI], its employees, agents and representatives, **sustained in connection with**

---

[3] The AOS was executed by PPG and IPI. After Axiall acquired the plant, IPI signed a consent to the transfer of the AOS, understood that the AOS was being transferred, and was aware that the AOS had to be transferred if it wanted to continue working at the Natrium facility. Moreover, all of the POs accepted by IPI contained language on the front page stating that they were "contingent on previously signed and returned Agreement for On-Site Services."

**performance of the Services, arising from any cause whatsoever (including without limitation, injuries resulting from failure of or defect in any equipment, instrument or device supplied by [Axiall and Eagle Natrium] or their employees to [IPI], its employees, agents or representatives at the request of [IPI], its employees, agents or representatives), except to the extent arising out of the sole negligence or willful misconduct of [Axiall and Eagle Natrium] or [their] employees acting within the scope of their employment.** The indemnification obligation of this Section 4. shall be deemed modified as required to exclude that degree of indemnification required aforesaid which is expressly prohibited by applicable law, statute or regulation, if any; but to the extent the aforesaid indemnification obligation is valid and enforceable, it shall remain in effect though modified. The indemnity obligations of [IPI] hereunder shall survive the termination or expiration of this Agreement and of any applicable Accepted Order.

(Emphasis added).

Section 1 of the AOS defines its Scope of Services, in part, as: "certain on-site services to be performed by [IPI], at the [Plant], per the performance schedule, the pricing therefor, and for [Axiall and Eagle Natrium] as shall be specified and described in an 'Accepted Order', and as required by and in accordance with [the AOS]." "Accepted Order" is defined as, among other things, a purchase order ("PO").

The Scope of Services section in the AOS also contained wording addressing how to resolve any inconsistencies or conflicts between the AOS and a PO with its

5

incorporated Terms and Conditions. According to the AOS Scope of Services, the following priority was to be followed in the event of conflict or inconsistency:

> If there are any terms or conditions in an Accepted Order which are inconsistent with or in conflict with this Agreement, the terms and conditions of the various documents constituting this Agreement shall control in the following priority and order: the front of the Accepted Order; this Agreement; and, then the reverse side terms and conditions of the Accepted Order.

The work involved in this appeal was subject to PO 4510044817 which related to IPI's August 2016 job assignment.[4] The front page of this document contained no language relating to indemnity. The back of the page, however, contained the following language, in bold capital letters: **"THIS PURCHASE ORDER IS SUBJECT TO, INCLUDES AND INCORPORATES HEREIN BY REFERENCE THE UNITED STATES PURCHASE ORDER GENERAL CONDITIONS FOR Eagle Natrium LLC LOCATED AT HTTP://WWW.AXIALL.COM/COMPANY."** The Terms and Conditions document contains its own indemnification provision. Section 13 provides:

> [IPI] assumes the risk of all damage, loss, costs and expense, and agrees to indemnify, defend and hold harmless [Axiall and

---

[4] For some reason, this particular PO was not signed by a representative of IPI, but such signature was not required for acceptance. According to the first paragraph of the Terms and Conditions, a PO could be accepted by failing to object in writing to its terms with ten days, or by "undertaking to provide the materials, services or work" described in the PO. In addition, the parties had a long history of using POs which incorporated the Terms and Conditions by reference. Given this history between the parties, we have no trouble concluding that IPI was subject to the PO and its incorporated Terms and Conditions. *See generally Westinghouse Elec. Co. v. Murphy, Inc*., 228 A.2d 656 (Pa. 1967).

Eagle Natrium], [their] officers, employees and representatives, from and against any and all damages, claims, **demands**, expenses (**including reasonable attorneys' fees),** losses or liabilities of any nature whatsoever, and whether involving injury or damage to any person (including employees of [IPI] and [Axiall and Eagle Natrium]) or property, and any and all suits, causes of action and proceedings thereon **arising or allegedly arising from or related to the subject matter of this Purchase Order, except where such injury or damage was caused by the sole negligence** of [Axiall and Eagle Natrium]. This indemnity shall survive the termination or cancellation of this Purchase Order, or any part hereof.

(Emphasis added).

On January 29, 2018, approximately a year and a half after the first chlorine leak, IPI and Mr. Taylor filed their complaint against Axiall and Eagle Natrium with respect to both gas leaks, raising claims for personal injury and property damage under several legal theories. On June 17, 2019, Axiall and Eagle Natrium amended their Answer to include a counterclaim for, among other things, IPI's alleged failure to hold them harmless, and to indemnify and defend them in relation to the claims regarding the chlorine releases.[5] On September 24, 2021, Axiall and Eagle Natrium amended their counterclaim to include a claim for breach of contract, based on the purported failure of IPI to indemnify them regarding the August 2016 railcar chlorine gas leak pursuant to the terms of the AOS and the Terms and Conditions incorporated in the PO.

---

[5] Mr. Taylor was not a party to the AOS, PO, and Terms and Conditions, so the respondents did not sue him for indemnification or breach of contract.

7

On May 23, 2022, respondents filed their motion for partial summary judgment on their counterclaim related to indemnity for the August 2016 railcar release pursuant to Rule 56(c) of the West Virginia Rules of Civil Procedure. This motion argued that (1) the AOS and PO contained choice of law provisions, and that Pennsylvania substantive law governed the circuit court's interpretation of the AOS's and PO's indemnification provisions; (2) the AOS's and PO's indemnification provisions were "clear and unequivocal" under Pennsylvania law and therefore applied to claims arising from respondents' own negligence; (3) IPI's and Mr. Taylor's claims fell squarely within the scope of those indemnity provisions, and (4) IPI must reimburse Axiall and Eagle Natrium for their costs and expenses related to the August 2016 gas leak, including attorney's fees related to this litigation.

In its response, IPI opposed the summary judgment motion, arguing that the language of the AOS's and PO's indemnification provisions did not apply to the gas leak; that there were genuine issues of material fact concerning whether the respondents were solely negligent, grossly negligent, or guilty of willful misconduct; and that the damages from the second leak, which occurred on October 8, 2016, were inextricably related to the damages sustained from the first leak, which occurred in August 2016.[6]

---

[6] The alleged relationship of damages resulting from the two leaks is not an issue on appeal.

On September 12, 2022, the circuit court entered its order granting respondents' motion for partial summary judgment. In its order, the circuit court found the choice of law provision in the AOS to be valid and enforceable, and therefore concluded that Pennsylvania law governed its interpretation and application of the indemnification provisions as they related to the railcar leak.

The circuit court also determined that IPI entered into binding and enforceable contracts, including independent indemnification obligations contained in the AOS and the Terms and Conditions incorporated by reference in the PO. In Paragraph 8 of the Conclusions of Law contained in its order, it held that under both indemnification provisions, IPI agreed to indemnify respondents for "any and all claims, liability, damage, loss, penalties, fines, cost, and expense of any kind whatsoever, sustained in connection with performance of the Services arising from any cause whatsoever, except in circumstances of sole negligence or willful misconduct (under the AOS), or sole negligence (under the Terms and Conditions)." For this reason, the circuit court concluded that the language of both indemnity provisions was "clear and unequivocal." As the lower court noted, under Pennsylvania law, an agreement to indemnify a party does not apply to claims resulting from its own negligence unless the language of the agreement is "clear and unequivocal."

9

The circuit court also determined that Axiall and Eagle Natrium were not solely negligent and did not engage in willful misconduct related to the railcar leak, circumstances which would preclude any duty to indemnify under the otherwise valid and independent indemnity provisions.[7] It further concluded that IPI had, and continues to have, a duty to indemnify, defend, and hold harmless, Axiall and Eagle Natrium from the railcar leak claims. Likewise, the circuit court held that any damages IPI incurred related to the railcar leak arose out of, and related to, the services being performed or otherwise being provided by them pursuant to the PO, the incorporated Terms and Conditions, and the AOS. Specifically, it was determined that the crack in the railcar that was responsible for the leak was a "failure of or defect in any equipment, instrument, or device . . ." under the AOS.

Finally, the circuit court determined that IPI had breached the AOS, PO, and Terms and Conditions by filing suit against Axiall and Eagle Natrium regarding the chlorine leak, and that Axiall and Eagle Natrium had incurred damages as a result, which would be determined in a separate hearing. The circuit court granted summary judgment for the breach of contract and express indemnity counterclaims, and this appeal followed.

---

[7] Although briefed and argued by the parties, the lower court did not determine whether IPI was required to indemnify the respondents if respondents were grossly negligent, as opposed to merely negligent, or whether there was a genuine issue of fact as to whether the respondents had been grossly negligent.

10

## II. STANDARD OF REVIEW

"Appellate review of a partial summary judgment order is the same as that of a summary judgment order, which is *de novo*." Syl. Pt. 1, *W. Va. Dep't of Transp. v. Robertson*, 217 W. Va. 497, 618 S.E.2d 506 (2005). In conducting a *de novo* review, we are mindful that "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." *Id.* at 501, 618 S.E.2d at 510 (quoting Syl. Pt. 3, *Aetna Cas. & Sur. Co. v. Federal Ins. Co. of New York*, 148 W. Va. 160, 133 S.E.2d 770 (1963)).

> Summary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove.

Syl. Pt. 2, *Williams v. Precision Coil, Inc.,* 194 W. Va. 52, 459 S.E.2d 329 (1995). The court's role "is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* at 59, 459 S.E.2d at 336 (internal quotation marks omitted). In reviewing motions for summary judgment any permissible inferences must be drawn in the light most favorable to the nonmoving party. *Id.*

Under both West Virginia and Pennsylvania law, the interpretation of a contract is a legal question freely reviewable on appeal. *Miller v. St. Joseph Recovery Ctr., LLC*, 246 W. Va. 543, 549, 874 S.E.2d 345, 351 (2022); *Nevyas v. Morgan*, 921 A.2d 8,

11

15 (Pa. Super. Ct. 2007), (quoting *Currid v. Meeting House Restaurant, Inc.*, 869 A.2d 516, 519 (Pa. Super. Ct. 2005)).[8]

### III.  DISCUSSION

As discussed below, the parties were subject to the indemnity provisions contained in the AOS and the Terms and Conditions incorporated in the PO. Because the language of these provisions was conflicting and inconsistent, we apply the language of the AOS pursuant to the priority established by the AOS. Our analysis of the indemnity provision in the AOS is governed by Pennsylvania law in keeping with the language of the AOS, the agreement of the parties, and the holding of the lower court. Under Pennsylvania law, the language of the indemnity provision was sufficiently clear and unequivocal to require indemnification for at least some degree of negligence on the part of the indemnitees. We vacate in part and remand this matter to the lower court for further

---

[8] The interpretation of any contract is a question of law and this Court's scope of review is plenary. Moreover, we need not defer to the conclusions of the trial court and are free to draw our own inferences. In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement. When construing agreements involving clear and unambiguous terms, this Court need only examine the writing itself to give effect to the parties' understanding. This Court must construe the contract only as written and may not modify the plain meaning under the guise of interpretation.

*Nevyas v. Morgan*, 921 A.2d 8, 15 (Pa. Super. Ct. 2007) (quoting *Currid v. Meeting House Restaurant, Inc.,* 869 A.2d 516, 519 (Pa. Super. Ct. 2005)).

development of the issue concerning the scope of the indemnity provision, and if necessary, for further consideration of whether there were genuine issues of material fact regarding the existence of sole negligence, gross negligence, and willful misconduct on the part of the respondents.

## A. Choice of Law

The AOS contains the following paragraph concerning choice of law: "14.4. <u>Governing Law</u>. This Agreement, each Accepted Order and the relations and rights of the Parties hereunder are made under and shall be governed by the local laws of the Commonwealth of Pennsylvania (without giving effect to the conflict of law principles thereof)." Under West Virginia law, a choice of law provision is presumptively valid unless (1) "the provision bears no substantial relationship to the chosen jurisdiction" or (2) "the application of the laws of the chosen jurisdiction would offend the public policy of this State." *W. Va. CVS Pharmacy, LLC v. McDowell Pharmacy, Inc.,* 238 W. Va. 465, 471, 796 S.E.2d 574, 580 (2017). In this case, the parties agreed below and before this court that Pennsylvania law is applicable, and the lower court so held. Thus, this Court interprets and applies the indemnification clauses as they relate to the Railcar Release under Pennsylvania law and we affirm the ruling of the lower court on this issue.

13

**B. IPI's Duty to Hold Harmless, Defend, and Indemnify Was Defined and Controlled by the AOS.**

In this case, there are two documents which contain indemnity provisions: the AOS and the PO with its incorporated Terms and Conditions. The parties are subject to both agreements, but the language of the two indemnity provisions is not the same. Respondents argue that the language of the two provisions is consistent and non-conflicting so that both provisions are applicable, while IPI takes the position that the two provisions are inconsistent and conflicting and therefore the indemnity language of the AOS controls by virtue of its priority language.

Unfortunately, the order entered by the lower court did not discuss whether there was any inconsistency or conflict between the two indemnity agreements, or even mention which document should be given priority in the event of a conflict. In Paragraphs 10, 15 and 16 of its order, it refers to claims by IPI and Mr. Taylor "related to the Railcar Release." "Related to" language appears in the Terms and Conditions, but not in the AOS. In Paragraph 11, the lower court states that: "To the extent [IPI and Mr. Taylor] incurred any type of damages related to the Railcar Release, all such damages arose out of the services being performed or otherwise being provided by IPI and Mr. Taylor pursuant to PO 4510044817, the incorporated Terms and Conditions and the AOS." "Arising" language appears in both the AOS and the Terms and Conditions, while "related to" language appears only in the Terms and Conditions. Thus, the lower court has referenced

14

and applied indemnity language from both documents. It is unclear from the language of its order whether the lower court concluded that the two sets of indemnity provisions were not inconsistent or conflicting, or that it did not matter whether there was an inconsistency because a duty to indemnify would exist regardless of which agreement was applied.

For reasons discussed below, we conclude that the language of the two indemnity provisions was inconsistent and in conflict in various respects. Accordingly, pursuant to the Scope of Services Paragraph in the AOS, we also conclude that the duty of IPI to hold harmless, defend, and indemnify the respondents was controlled by the indemnity paragraph of the AOS.

Initially, we note the many differences in wording between the AOS and the Terms and Conditions. For example:

The AOS contains language obligating IPI to indemnify the respondents from "any and all claims, liability, damage, loss, penalties, fines, cost and expenses of any kind whatsoever." The corresponding language of the Terms and Conditions includes an

15

additional term ("demands") and a parenthetical after "expenses" indicating that attorney fees are included. The AOS does not expressly refer to attorney expenses.[9]

The AOS refers to claims "arising out of this Agreement and/or the Services…" while the Terms and Conditions refers to claims "arising or allegedly arising from or related to the subject matter of this Purchase Order…" Assuming that the "related to" language is not superfluous, the wording of the Terms and Conditions is arguably broader than the wording of the AOS.

The AOS contains a clause referring to injury, death, or property damage involving IPI and its employees "sustained in connection with performance of the Services…." The Terms and Conditions indemnity provision does not contain similar "sustained in" language.

---

[9] The parties disagree as to whether the language of the AOS, which refers to "expense of any kind," is sufficient to permit the recovery of attorney fees, and therefore is not inconsistent or in conflict with the language of the Terms and Conditions. Respondents argue that the two provisions are consistent, relying on *Fidelity-Philadelphia Trust Co. v. Philadelphia Transp. Co.*, 173 A.2d 109, 113-14 (Pa. 1961), where the court held that language requiring a party to "reimburse the Trustee for **all its expenditures**, and to indemnify and save the Trustee harmless against any liabilities which it may incur in the exercise and performance of its powers and duties" was "sufficiently specific to include attorneys fees." (Emphasis added). Although noting that this may be an issue for the lower court to resolve on remand, we express no opinion regarding this specific question.

The AOS contains a clause "arising from any cause whatsoever (including without limitation, injuries resulting from failure of or defect in any equipment, instrument or device supplied by [respondents] or their employees to [IPI], its employees, agents or representatives at the request of [IPI], its employees, agents or representatives)…" The Terms and Conditions indemnity paragraph does not include the wording "arising from any cause whatsoever" nor does it refer to defects or failures in equipment, instruments or devices supplied by respondents. Thus, the language of the AOS is arguably broader than the language of the Terms and Conditions, and specifically refers to some situations where the respondents will be indemnified for claims involving injuries and losses caused by their own fault.

The AOS also contains a provision limiting the duty to indemnify which states "except to the extent arising out of the sole negligence or willful misconduct of [the respondents] or [their] employees acting within the scope of their employment." The corresponding provision of the Terms and Conditions is limited to sole negligence, stating "except where such injury or damage was caused by the sole negligence of the [respondents]." In other words, it does not mention willful misconduct.

Because of these many differences, we find the AOS and the Terms and Conditions to be inconsistent and conflicting, and because of the priority established by the AOS, we hold that the indemnity language of the AOS controls the issue of indemnity. On

17

remand, the lower court should limit its analysis to the language of the AOS in resolving the issues presented in this case.

**C. The Indemnity Language of the AOS Was Sufficiently Clear and Unambiguous to Provide Indemnity For At Least Some Degree of Respondents' Own Negligence.**

Pennsylvania law allows parties to obtain indemnification for injuries caused by their own negligence provided that the language of the indemnification agreement is clear and unequivocal. Such contracts are not contrary to the public policy of West Virginia, and thus may be enforced by our courts. In this case, we conclude that the agreements at issue clearly and unequivocally provide that Axiall and Eagle Natrium are entitled to defense and indemnity for injuries caused by their concurrent or shared negligence where injuries and losses to other parties have not been caused by the sole negligence of Axiall and Eagle Natrium.

In the seminal case of *Perry v. Payne*, 66 A. 553 (Pa. 1907), the Pennsylvania Supreme Court construed an indemnity bond which provided that the indemnitors "shall protect and keep harmless the said Edward Perry [indemnitor] … from damages arising from accidents to persons employed in the construction of, or passing near, the said work…." *Id.* at 554. The court rejected the indemnitor's argument that this general language indemnified him against damages arising from injuries to any person employed

about the work, even when the injuries were caused by the negligence of the indemnitee himself or his employees. *See id*. at 556. In doing so, the court stressed the extraordinary nature of indemnifying the indemnitee against his own negligence:

> It is contrary to experience and against reason that the contractors should agree to indemnify Perry against the negligence of himself or his employes [sic]. It would make them insurers, and impose a liability upon the contractors, the extent of which would be uncertain and indefinite, and entirely in the hands of Perry. The results of such a liability might become most disastrous.

*Id*. at 555.

The court went on to say that an indemnity contract must expressly stipulate against the indemnitee's own negligence, and that "words of general import" would not be sufficient:

> We think it clear, on reason and authority, that a contract of indemnity against personal injuries, should not be construed to indemnify against the negligence of the indemnitee, unless it is so expressed in unequivocal terms. The liability on such indemnity is so hazardous, and the character of the indemnity so unusual and extraordinary, that there can be no presumption that the indemnitor intended to assume the responsibility unless the contract puts it beyond doubt by express stipulation. No infernce [sic] from words of general import can establish it.

*Id*. at 557.

Eighty-four years later, in *Ruzzi v. Butler Petroleum Co*., 588 A.2d 1 (Pa. 1991), the high court reaffirmed the *Perry* rule that contracts which purport to indemnify a party for its own negligence must clearly and unequivocally state that intent, saying:

> The law has been well settled in this Commonwealth for 87 [sic] years that if parties intend to include within the scope of their indemnity agreement a provision that covers losses due to the indemnitee's own negligence, they must do so in clear and unequivocal language. No inference from words of general import can establish such indemnification.

*Id*. at 7. The contractual language reviewed in that case provided that:

> [The Zinssers] ... exonerate, discharge, and agree to protect and save harmless and indemnify [Butler Petroleum] ... from any and all liability for claims for loss, damage, injury or other casualty to persons or property ... caused or occasioned by any leakage, fire, explosion or other casualty occurring through any imperfection in, injury or damage to, or by reason of the installation, use, operation and/or repair of the said equipment or of the premises.

*Id*. at 8.

The court concluded that this language did not indemnify the indemnitee from liability for its own negligence, reasoning that:

> Because *Perry* was the law in this jurisdiction when Butler Petroleum and the Zinssers entered into their indemnification agreement we must assume that they knew that the law would not recognize as effective their agreement concerning the *negligent* acts of the indemnitee (Butler Petroleum) unless an express stipulation concerning

20

negligence was included in the document. This rule of contract interpretation like the law applicable to any contract is a part of this agreement as if expressly incorporated in its terms…

We must assume that the parties knew that the law gives to the words used herein a specific meaning and that the words, therefore, must be interpreted in their legal sense. We must also assume that the parties wrote this agreement in conformity to these well established rules of contract construction. That being the case, we conclude that the only intent that can be gleaned from this document is that the parties did not intend to indemnify for acts of the indemnitee's negligence, since words of general import are used. We can discern no reason to abandon the *Perry* rule of contract interpretation which is still a valuable rule of construction, rooted in reason and authority and reject Butler Petroleum's contrary arguments.

*Id*. at 8-9 (citations omitted).

The *Perry-Ruzzi* rule, requiring clear and unequivocal language to indemnify a party for its own negligence, has been repeatedly reaffirmed by the Supreme Court of Pennsylvania in the years since 1991. *See, e.g., Greer v. City of Philadelphia*, 795 A.2d 376, 380 (Pa. 2002); *Bernotas v. Super Fresh Food Markets, Inc.*, 863 A.2d 478, 482-83 (Pa. 2004). "[T]he core concern addressed by the [*Perry-Ruiz*] rule is broadly worded indemnification provisions that would place the indemnitor in, essentially, the position of an insurer of the indemnitee's own negligence." *Snair v. Speedway LLC*, 1:18-CV-00333-CCW, 2021 WL 168329, at *9 (W.D. Pa. Jan. 19, 2021) (internal quotation marks omitted). *See generally* Thomas M. Kurke, *Contract Law—Has Pennsylvania Adopted An Express Negligence Rule For Interpreting Broad, All-Inclusive Indemnity Agreements?—Ruzzi v.*

21

*Butler Petroleum Co., 588 A.2d 1 (Pa. 1991)*, 65 Temp. L. Rev. 679, 692 ("The Pennsylvania Supreme Court … fashioned the *Perry* rule, … because of its concern that an indemnitor could become the unwilling insurer of an indemnitee if the court interpreted a broad, all-inclusive indemnity provision to reach the negligent acts of the indemnitee.").

In the present case, the indemnity paragraph of the AOS contains language of general import ("all," "any and all," "any kind"), but that language is followed by a clause providing that the indemnitee will not be indemnified for liability resulting from the sole negligence or willful misconduct of the indemnitee or its agents or employees while acting within the scope of their employment. Thus, we must determine whether the exclusion of indemnification for the sole negligence or willful misconduct of the indemnitee clearly and unequivocally provides for indemnification when the indemnitee is not solely negligent or willful. We hold that it does.

In reaching this conclusion, we find that Pennsylvania courts, both state and federal, have frequently held that language in an indemnity agreement which excludes coverage for the sole negligence of the indemnitee necessarily implies that the partial or concurrent negligence of the indemnitee is covered. *See, e.g.*, *Bernotas v. Super Fresh Food Markets, Inc.*, 863 A.2d 478, 483 (Pa. 2004); *Woodburn v. Consol. Coal Co.*, 590 A.2d 1273 (Pa. Super. Ct. 1991); *Babcock & Wilcox Co. v. Fischbach & Moore, Inc.*, 280 A.2d 582 (Pa. Super. Ct. 1971); *Kiewit Eastern Co., Inc. v. L & R Constr. Co.,* 44 F.3d

1194, 1199-1200 (3rd Cir. 1995) (applying Pennsylvania law); *Draper v. Airco, Inc.*, 580 F.2d 91, 101 (3rd Cir. 1978) (applying Pennsylvania law); *Holdridge v. Atchison*, *Topeka and Santa Fe Ry. Co.*, Civ. A. No. 92C-05-242, 1994 WL 680109, at *5 (Del. Super. Ct. Oct. 7, 1994) (concluding that Pennsylvania courts typically enforce indemnification clauses when they contain a "sole negligence exception").

We also note that the AOS provides in part that the indemnitee is indemnified for liability "arising from any cause whatsoever (including without limitation, injuries resulting from failure of or defect in any equipment, instrument or device supplied by [Axiall/Eagle Natrium] or their employees to [IPI], its employees, agents or representatives at the request of [IPI], its employees, agents or representatives)…" Although this language is not applicable to the case at bar because the railcar that leaked was not supplied to, or requested by, IPI, it indicates that Axiall and Eagle Natrium will be indemnified against their own negligence in at least some situations.[10]

---

[10] Our decision that the indemnity language of the AOS is sufficiently clear and unequivocal to permit the respondents to be indemnified for at least some degree of negligence on their part, does not mean that other aspects of the indemnity paragraph are free from ambiguity. In particular, as discussed in Section D of this opinion, we remand the issue of the scope of the obligation and the nexus required between the work being performed by IPI and the injuries resulting from chlorine exposure to the lower court for further development.

Having determined that the AOS indemnifies Axiall and Eagle Natrium against liability arising from their concurrent or shared negligence, we must now consider whether these contracts are unenforceable as being contrary to the public policy of West Virginia. We hold that they are not. It is well established that contracts which indemnify a party for its own negligence do not violate the public policy of West Virginia, but the language of such agreements must be "clear and definite."[11] *See* Syl. Pt. 3, *Elk Run Coal Co., Inc. v. Canopius U.S. Ins., Inc.*, 235 W. Va. 513, 775 S.E.2d 65 (2015); *Dalton v. Childress Serv. Corp.*, 189 W. Va. 428, 431, 432 S.E.2d 98, 101 (1993); Syl. Pt. 1, *Sellers v. Owens-Illinois Glass Co.*, 156 W. Va. 87, 191 S.E.2d 166 (1972); W. Va. Code § 5-8-14 (1975).[12]

**D. The Lower Court Did Not Adequately Explain Its Decision Concerning the Nexus Required By the Indemnity Language to Permit Meaningful Appellate Review.**

The parties disagree on what kind of nexus or connection was required between the work that IPI was doing and the resulting injuries which allegedly gave rise to a duty to hold harmless, indemnify and defend. IPI takes the position that the injuries had

---

[11] This is essentially the same language as "clear and unequivocal." *See Sellers v. Owens-Illinois Glass Co.*, 156 W. Va. 87, 93, 191 S.E.2d 166, 170 (1972) (our rule is not "a departure from the general rule" although "other courts have frequently employed such phrases as 'clear and unequivocal' or 'clear and explicit….'")

[12] Because it is unnecessary to this appeal, we express no opinion as to whether agreements which purport to indemnify a party for gross negligence or willful misconduct would violate the public policy of West Virginia.

24

to have some sort of causal relationship to the work it was performing pursuant to the PO[13] while the respondents take the position that a "but for" relationship was sufficient, *i.e.*, that the personal injuries and property damage would not have occurred if the work being performed by the respondents had not required them to be at the jobsite when the chlorine leak occurred.[14] The lower court concluded that the indemnification agreements applied to the facts of this case without any citation or analysis of the authorities from Pennsylvania

---

[13] IPI acknowledges that the claims to be indemnified do not necessarily have to arise from its own negligence, either in whole or in part where they involve "any equipment, instrument or device" supplied by respondents to IPI at its request. For example, there would be a duty to indemnify if respondents provided IPI with scaffolding at IPI's request which turned out to be defective and resulted in injury.

[14] This is similar to an argument rejected by the Supreme Court of Pennsylvania in *Darrow v. Keystone 5, 10, 25, $100 Stores, Inc.,* 74 A.2d 176 (Pa. 1950) where the plaintiff leased a second-floor apartment in a building owned by the defendant, and a fire in the basement caused by the defendant lessor damaged the property of the lessee. When the lessee sued, the lessor raised an exculpatory release in the lease as a defense stating that "[t]he Lessee expressly agrees to assume all liability of accident or damage due to said occupancy." The court reasoned that:

> What the lessee assumed was 'all liability of accident or damages due *to said occupancy*' (emphasis supplied). Manifestly, the fire did not occur because the lessee was in possession of the second floor of the building. **The damage was not due 'to said occupancy' unless it be suggested that the plaintiff and his father would not have suffered any loss from the fire had the father not been the lessee of the second-floor apartment**. Of course, the clause is not rightly susceptible of any such meaning.

*Id*. at 177. (emphasis added). While the present case involves indemnity language rather than an exculpatory clause, "there is such a substantial kinship between both types of contracts as to render decisions dealing with indemnity clauses applicable to decisions dealing with exculpatory clauses, and vice versa." *Dilks v. Flohr Chevrolet, Inc*., 192 A.2d 682, 688 n. 11 (Pa. 1963).

and other jurisdictions referenced by the parties.[15] Nor was there any discussion of the rules of construction to be applied in construing those indemnity provisions. On remand, the lower court should more fully develop its analysis of the applicable law and relevant facts. Although we do not resolve the nexus issue, leaving it for the lower court to resolve in the first instance, we note some significant areas and issues for the lower court's consideration.

First, under Pennsylvania law, the primary purpose of contract interpretation is to give effect to the intention of the parties. *Ratti v. Wheeling Pittsburgh Steel Corp.,* 758 A.2d 695, 702 (Pa. Super. Ct. 2000). In this case, it is difficult for this Court, given the record currently before it, to imagine that IPI intended to be an insurer for claims arising from causes completely unrelated to the work it was hired to perform, and over which it

---

[15] We note in this regard that in jurisdictions where indemnity clauses are narrowly construed against the indemnitee, such as Pennsylvania, courts frequently require some causal connection between the indemnitor's activities and the resulting injuries. *See* Marc M. Schneier, Contractual Indemnity, Chapter 8.C, *Construction Accident Law* (ABA 1999):

> In sole negligence cases, courts often focus on the agreement's "nexus language." Difficulties arise in trying to ascertain the limits that should be placed on broad nexus language, which uses terms such as "arise out of," "incident to," "in connection with," or "be occasioned by." Consistent with the approach of strictly construing indemnity agreements that seek to indemnify the indemnitee for its own negligence, most courts tend to read a causation requirement into broad nexus language. Under this approach, there is no nexus unless an indemnitor's conduct was also a causal factor--even if shared with the indemnitee--in the accident.

26

had no control. In reviewing indemnity agreements, the Supreme Court of Pennsylvania has frequently observed that it will not assume that parties have agreed to act as insurers and expose themselves to potentially devastating liability unrelated to their own actions. *See Perry v. Payne*, 66 A. 553, 555 (Pa. 1907); *Pittsburgh Steel Co. v. Patterson-Emerson-Comstock, Inc.*, 171 A.2d 185, 189 (Pa. 1961).[16] Consequently, it will not recognize and enforce such an obligation unless it is expressed in clear and unequivocal terms.

Second, under Pennsylvania law, which the indemnity agreements required the court to apply, the indemnity language was required to be strictly construed against the indemnitee, and any ambiguities resolved against the drafter, especially when the drafter was also the indemnitee. *Jacobs Constructors, Inc. v. NPS Energy Servs., Inc.*, 264 F.3d 365, 371 (3d Cir. 2001) (applying Pennsylvania law); *El v. Southeastern Penn. Trans. Authority*, 297 F.Supp.2d 758, 762 (E.D. Pa. 2003) ("Pennsylvania law has long acknowledged that indemnity clauses are construed most strictly against the party who

---

[16] *In Pittsburgh Steel Co. v. Patterson-Emerson-Comstock*, *Inc.*, 171 A.2d 185, 189 (Pa. 1961), the court reasoned that:

> The indemnitee remained in possesion [sic] of the premises. Its own employees continued working under its exclusive control. Under the construction contended for by plaintiff, [the contractor] and in turn [the subcontractor] would be made insurers for acts of negligence over which they had or could have no control. Without more direct and unequivocal language in the contract, it is unreasonable to infer or conclude that the parties intended an indemnification of such magnitude.

27

drafts them especially when that party is the indemnitee."); *Bernotas v. Super Fresh Food Markets, Inc.*, 863 A.2d 478, 482 (2004) ("It is well settled in Pennsylvania that provisions to indemnify for another's party's negligence are to be narrowly construed…"); *Ruzzi v. Butler Petroleum Co.*, 588 A.2d 1, 7 (Pa. 1991); *Ratti v. Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695, 703 (Pa. Super. Ct. 2000) ("our rules require us to strictly construe such agreement against its drafter."). Although Axiall and Eagle Natrium did not draft the AOS, as successors in interest to PPG, which did draft the AOS, any ambiguities in that document must be construed against them. *See Associates of Chapman Lake v. Long*, 253 A.3d 1210, 1219 (Pa. Super. Ct. 2021).

Next, in Paragraph 13 of its order, the lower court declared that: "The crack in [railcar] 1702 leading to the Railcar Release, constitutes a 'failure of or defect in any equipment, instrument, or device…' under the AOS." Unfortunately, the court failed to explain why this language was relevant to its decision.[17] When we consider the full clause, and not just this snippet, it is hard to see how this language supports the lower court's ruling. To put this language in context, the AOS refers to claims arising from "injuries resulting from failure or defect in any equipment, instrument or **device supplied by Buyer or their employees to Contractor, its employees, agents or representatives at the**

---

[17] In their appellate brief, the respondents actually argue that this language is irrelevant and that we should ignore it. We are inclined to agree with respondents given the record currently before us.

28

**request of Contractor, its employees, agents or representatives**…" (Emphasis added). In this case, the defective railcar which leaked chlorine was not requested by, or supplied to, IPI. To the extent the lower court used this language to support its ruling on the scope of the indemnity language, its reliance appears to have been misplaced. On remand, if the court refers to this language, it should explain how it is relevant to its decision and relate it to the facts of this case.

It is well established that a circuit court's order "must be sufficient to indicate the factual and legal basis for the [court's] ultimate conclusion so as to facilitate a meaningful review of the issues presented." *Meagan S. v. Terry S.*, 242 W. Va. 452, 457, 836 S.E.2d 419, 424 (2019) (internal quotation marks omitted). Unfortunately, the order at issue in this case does not adequately explain the basis for its ruling on this issue and needs further development. The "issues were not adequately addressed by the lower court, and we must remand for completion of this task." *Mary Jean H. v. Pamela Kay R.*, 198 W. Va. 690, 693, 482 S.E.2d 675, 678 (1996) (per curiam). Accordingly, we vacate in part and remand for further development of this issue.

**E. If the Lower Court Determines that There Was A Sufficient Nexus Between IPI's Activities and the Resulting Injuries to Trigger a Duty to Indemnify, It Will Need to Determine Whether There Were Genuine Issues of Material Fact Concerning Sole Negligence, Willful Misconduct or Possibly Gross Negligence.**

The lower court held as a matter of law that the respondents were neither solely negligent nor guilty of willful misconduct. IPI contends that the lower court improperly failed to consider certain documents that allegedly would establish a jury question as to whether the respondents had been solely negligent, grossly negligent, or guilty of willful misconduct. It also argues that the lower court failed to consider the effect of our comparative fault statute.

On remand, if the lower court determines that personal injury and property damage caused by the chlorine leak arose from work performed by IPI, and therefore was within the scope of the applicable indemnity provision, it will need to re-examine whether there are genuine issues of material fact concerning sole negligence or willful misconduct. In addition, the lower court will need to address the question of whether the indemnity agreement applies to gross negligence on the part of the respondents, and whether there is a genuine issue of material fact concerning the existence of gross negligence.

30

**1. Rule 56 Summary Judgment Threshold Competency**

IPI has argued that there are several genuine issues of material fact which make summary judgment inappropriate, such as whether the respondents inspected the railcar frequently enough, and whether they should have attempted to fix the problems identified in the 2006 safety advisory more quickly than they did. Mr. Taylor has also alleged that respondents failed to sound an alarm when the massive chlorine leak at issue in this case occurred, and that his escape from the toxic cloud was impeded and delayed by a locked gate.[18]

> In footnote 1 of its order, the lower court stated that:
>
> > [IPI and Mr. Taylor] submitted numerous exhibits with their briefing that did not meet the threshold requirements for consideration as set forth in Rule 56 of the West Virginia Rules of Civil Procedure and as further discussed by the West Virginia Supreme Court of Appeals at Fn. 15 in *Ramey v. Contractor Enterprises, Inc.*, 225 W. Va. 424, 693 S.E.2d 789 (2010).

After ruling on the plaintiff's exhibits, the lower court concluded that "[n]o competent evidence has been presented to indicate that [respondents] were solely negligent or engaged

---

[18] In his complaint, Mr. Taylor also indicated that there had been an undue delay in transporting him to a hospital. If he is still making that claim, that would be an additional factual issue. We recognize that there may be additional issues which are not apparent from our record on appeal, such as the role of different entities in causing the leak, and whether the respondents took reasonable measures to detect or contain the leak.

in any willful conduct in relation to the Railcar Release." (Footnote omitted).[19] It went on to hold that Axiall and Eagle Natrium had not been either solely negligent or guilty of willful misconduct, circumstances which would have precluded any duty on the part of IPI to indemnify.[20]

IPI complains that the lower court improperly failed to consider the twelve documents[21] it submitted in opposition to summary judgment, but only four of them appear to be relevant to the issue of liability—the deposition of Julie Bart (a 30 (b) (7) designee of the defendants), a 2006 safety advisory by the Federal Railroad Administration (FRA), the accident report by the National Traffic Safety Board (NTSB), and the deposition of Mr. Taylor.[22] The parties disagree as to whether at least some of these documents were competent for purposes of opposing a motion for summary judgment.

_____

[19] The lower court also observed that IPI had not designated an expert to opine who was responsible for the chlorine leak. The court did not discuss or explain why an expert was required in this case, or why IPI had the burden to produce one.

[20] The lower court did not make any findings concerning the possible negligence (or lack thereof) of any entities other than Axiall and Eagle Natrium.

[21] The lower court did not indicate what documents submitted by IPI did not meet "the threshold requirements for consideration" under Rule 56 and *Ramey v. Contractor Enterprises*, *Inc.*, 225 W. Va. 424, 693 S.E.2d 789 (2010). Consequently, IPI was left to assume for purposes of appeal that none of its documents were considered. Because the lower court did not specify which documents, if any, it may have considered, we shall discuss all of them.

[22] The other eight documents submitted by IPI consist of the P.O., a site map of the plant, Tri-State Ambulance Records, Reynolds Memorial Hospital Records, a MedEvac

Rule 56 (c) states that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." W. Va. R. Civ. P. 56. This rule does not provide "an exhaustive list of materials that may be submitted in support of [or in opposition to] summary judgment. In addition to the material listed by that rule, a trial court may consider any material that would be admissible or usable at trial." Syl. Pt. 1, *Aluise v. Nationwide Mut. Fire Insur. Co.*, 218 W. Va. 498, 625 S.E.2d 260 (2005).

"In order to make that determination [whether materials would be admissible at trial], the authenticity of documents presented for the court's consideration at the summary judgment stage needs to be established." *Ramey v. Contractor Enterprises, Inc.*, 225 W. Va. 424, 432 n. 15, 693 S.E.2d 789, 797 n. 15 (2010) (per curiam).

> Unsworn and unverified documents are not of sufficient evidentiary quality to be given weight in a circuit court's determination of whether to grant a motion for summary judgment. However, in its discretion the court may consider an unsworn and unverified document if it is self-authenticating under West Virginia Rule of Evidence 902 or otherwise carries significant indicia of reliability; if it has been signed or

---

Invoice, an expert report concerning the corrosive effect of chlorine on machinery and equipment, the AOS, and the General Terms and Conditions. At page 34 of its initial brief on appeal, IPI concedes that the AOS, PO, and Terms and Conditions "were of no consequence to the Court's determination of whether Axiall and Eagle Natrium were 'solely negligent,' engaged in 'willful misconduct,' or were 'grossly negligent.'" IPI has not explained why the remaining documents would be relevant to the liability issues in this case.

> otherwise acknowledged as authentic by a person with first-hand knowledge of its contents; or if there has been no objection made to its authenticity.

Syl. Pt. 6, *Butner v. Highlawn Memorial Park Co.*, 247 W. Va. 479, 881 S.E.2d 390 (2022).

Contrary to respondents' assertions in their brief on appeal,[23] documents which are not listed in Rule 56 need not be supported by affidavits given by persons with personal knowledge if they can be authenticated in other ways. Although affidavits are probably the most common form of evidence used to support or oppose "a Rule 56 motion [they] are not required by the rule; they are simply permitted." 10A Wright and Miller, Fed. Prac. and Proc. § 2722 Westlaw (database updated April 2023). Courts may consider an unsworn and unverified document "if it is self-authenticating under West Virginia Rule of Evidence 902 or otherwise carries significant indicia of reliability…" Syl. Pt. 6, *Butner,* 247 W. Va. at 492, 881 S.E.2d at 403. With these principles in mind, we will review the relevant documents submitted by IPI in opposition to summary judgment on the contribution counterclaims.

---

[23] Respondents' brief at p. 33 ("… Petitioners do not deny …that they failed to provide the necessary affidavits to support certain exhibits to their Response in Opposition to Summary Judgment briefing. Petitioners now seek to blame the Circuit Court for their own error..."). *See also* Transcript of July 18, 2022, trial court hearing at 17-18, App. 2387-88 (argument by respondents' counsel) ("… if you want to oppose a Motion For Summary Judgment, you have to have pleadings, discovery responses, deposition excerpts or **other things incorporated in an affidavit**.") (Emphasis added).

Julie Bart's deposition would have been competent under Rule 56 which expressly mentions depositions as something that may be considered in ruling on motions for summary judgment.[24] Ms. Bart's testimony contains many statements relating to the potential culpability of the respondents. For example, she testified about respondents' awareness of the extensive corrosion damage to the railcar that leaked, their awareness of the 2006 safety advisory and their actions to comply with it, and the contents of the NTSB report. She also testified that the railcar took longer than usual to repair (six months rather than the usual three to four months) because it was so badly corroded, and that there was a "back and forth" about whether to repair it or just to retire it from service. The lower court did not indicate whether it considered Julie Bart's deposition in ruling on the summary judgment motion concerning indemnity and if so, why it did not raise genuine issues of material fact.

Next, the 2006 safety advisory,[25] which was published in the Federal Register, was self-authenticating as an "official publication" under West Virginia Rule of

---

[24] No one has questioned the authenticity of the depositions used to support or oppose the motion for summary judgment in the lower court.

[25] Among other things, this safety advisory stated "that the fatigue-related safety concerns with the ACT-200 Stub sill design can be eliminated by modifying the underframe of the tank car in accordance with ACF's Maintenance Bulletin TC-200…" It went on say that in an earlier safety advisory it had recommended "that owners of unmodified ACF-200 tank cars bring these cars into conformity with Maintenance Bulletin TC-200… at the earliest practicable date."

Evidence 902 (5). *See Krumm v. Feuerhelm,* 298 N.W.2d 184, 188 (S.D. 1980) (non-certified copies of excerpts from Federal Register were admissible under Rule 902); 44 U.S.C. § 1507 (1968) (stating that "publication in the Federal Register creates a rebuttable presumption…that the copy contained in the Federal Register is a true copy of the original… and [t]he contents of the Federal Register shall be judicially noticed…").[26] Under Rule 56, this self-authenticating document could have been considered by the lower court in the exercise of its discretion. See W. Va. R. Civ. P. 56. The order by the lower court does not clearly indicate whether it recognized the nature of this document, or realizing that it was self-authenticating, decided to exercise its discretion not to consider it anyway.[27] If the former, we would need to review its decision for legal error; if the latter, for abuse of discretion.[28]

---

[26] There is no question that Axiall was aware of this safety advisory. Julie Bart testified in her deposition that she had read it, and that her employer (Axiall) had been aware of it and had modified its maintenance manual because of it.

[27] The language of the order holding that IPI's documents "did not meet the threshold requirements for consideration" suggests that the court felt it could not consider the documents even if it wanted to, but this court should not have to guess at the basis for the lower court's decision.

[28] IPI's initial brief is somewhat confusing on this point. At page 31, there is a heading which states that: "The circuit court abused its discretion in declining to consider the exhibits submitted by Appellants." Under this heading, which invokes **abuse of discretion**, IPI argues in part that the lower court misconstrued the threshold requirements of Rule 56 (a legal error), declaring that: "The circuit's finding inappropriately narrows the scope of exhibits that Rule 56 permits to be attached to summary judgment briefing and **distorts the standard for summary judgment exhibits set forth in *Ramey***." (Emphasis added).

The NTSB report was also self-authenticating as an "official publication" under Rule 902(5). S*ee generally* 31 Fed. Prac. & Proc. Evid. § 7139 Westlaw, (2d ed. Database updated April 2023) ("Rule 902 (5) has been applied to a wide range of official publications including… governmental studies or reports…"). In addition, it was an exhibit to Julie Bart's deposition, and it was discussed during her testimony. Documents may be authenticated by deposition testimony as well as by affidavits. *See Willing v. Arms*, Case No. 2:14-cv-01122-APG-PAL, 2016 WL 5109139 (D. Nev. Sept. 19, 2016); *Hussein v. University and Community College System of Nevada*, 2007 WL 4592225 (D. Nev. Dec. 28, 2007); *see generally* Louis J. Palmer, Jr., and Robin Jean Davis, *Legislation Handbook on West Virginia Rules of Civil Procedure* at 327 (5th ed.2017) ("A deposition is at least as good as an affidavit, and should be usable whenever an affidavit would be permissible…" ). Once again, it is not clear whether the lower court failed to recognize the self-authenticating nature of this document, simply chose not to consider it in the exercise of its discretion, or refused to consider it for another reason.

Although the authenticity of the NTSB report is beyond dispute, the parties disagree as to whether its use at trial would be precluded by 49 U.S.C. § 1154 (b) (2018) which provides that: "No report of the [National Transportation Safety] Board, related to an accident . . . may be admitted into evidence or used in a civil action for damages resulting from a matter mentioned in the report." 49 C.F.R. § 835.2 (1999) fleshes out the meaning

of "report" and draws a distinction in terms of admissibility for "Board accident report[s]" and "factual accident report[s]." According to this regulation:

> Board accident report means the report containing the Board's determinations, including the probable cause of an accident, issued either as a narrative report or in a computer format…. no part of a Board accident report may be admitted as evidence or used in any suit or action for damages growing out of any matter mentioned in such reports.

> Factual accident report means the report containing the results of the investigator's investigation of the accident. The Board does not object to, and there is no statutory bar to, admission in litigation of factual accident reports. In the case of a major investigation, group chairman fact reports are factual accident reports.

49 C.F.R. § 835.2 (1999). Because the lower court did not address the admissibility of the NTSB report, we will not resolve that issue on appeal, but the lower court may find it necessary to discuss that question on remand depending on how it rules on other matters.

Mr. Taylor's deposition indicated that he did not hear an alarm when the railcar leaked chlorine gas. A jury reasonably might infer from this that no alarm was sounded.[29] In addition, Mr. Taylor testified that he and his men tried to exit through a

---

[29] Circumstantial evidence that someone did not hear a warning signal may be sufficient to create a reasonable inference that the warning was not given. *See* Dan B. Dobbs, Paul T. Hayden, and Ellen Bublick, *The Law of Torts* § 166, Westlaw (2d ed.) (database updated May 2023) (footnotes omitted):

freight gate that was locked and had to be opened by a security guard. It was his understanding that he was supposed to use that gate. This testimony would be relevant to issues of negligence, gross negligence, and willful misconduct. The parties have not argued that this testimony could not or should not have been considered by the lower court in determining the existence of genuine issues of material facts.

Although it was not submitted by IPI in connection with the summary judgment motion concerning indemnification,[30] the lower court was supplied with another competent piece of evidence concerning liability. The respondents submitted excerpts from

> *Circumstantial evidence going to the jury*. If circumstantial evidence is sufficient to permit reasonable jurors to draw the inference sought, the issue goes to the jury, which assesses its weight, even though other and quite different inferences are also possible. Suppose the plaintiff is injured in a railroad crossing collision. She sues, contending that the train's engineer did not blow the whistle. The engineer testifies that he did, but the plaintiff's testimony is that she was in a position to hear a whistle and heard none. The jury could draw the inference that no whistle was blown by reasoning that the plaintiff probably would have heard the whistle if it were sounded. But of course the jury could also draw a different inference, even if it believes the plaintiff is telling the truth as she understands it. The jury could infer that the plaintiff was careless or paying no attention, distracted, or possibly suffering from hearing loss.

[30] IPI and Mr. Taylor did submit relevant pages from Mr. Linder's deposition in opposition to Axiall's and Eagle Natrium's motion for summary judgment pertaining to their personal injury and property damage claims. Respondent's two motions for summary judgment were pending before the lower court at the same time.

the deposition of Mr. Linder, a 30 (b) (7) designee of Axiall and Eagle Natrium, in support of their motion for summary judgment, in which Mr. Linder stated that the respondents did not place any blame on IPI for the Railcar Release. The lower court should have considered this deposition, as well as the material submitted by IPI, *see* Syl. Pt. 3 *Haga v. King Coal Chevrolet Co.*, 151 W. Va. 125, 150 S.E.2d 599 (1966) ("Upon motion for a summary judgment . . . all exhibits and affidavits and other matters submitted by **both** parties should be considered by the court….") (Emphasis added), but it was not discussed in its order. Although a trial court is not necessarily required to cite and discuss every piece of evidence it considers, the order at issue does not provide enough detail for us to conduct a meaningful review of its ruling.

As the West Virginia Supreme Court of Appeals held in Syllabus Point 3 of *Stout v. Ravenswood Aluminum Corp.*, 207 W. Va. 427, 533 S.E.2d 359 (2000) (per curiam):

> Although our standard of review for summary judgment remains de novo, a circuit court's order granting summary judgment must set out factual findings sufficient to permit meaningful appellate review. Findings of fact, by necessity, include those facts which the circuit court finds relevant, determinative of the issues and undisputed.

Given the conclusory allegations of the lower court's opinion and its cryptic footnote concerning the documents submitted by IPI in opposition to summary judgment, we are unable to determine whether it considered the depositions of Bart, Taylor, and

40

Linder, or assume that it duly considered all pertinent evidence. Consequently, we vacate and remand so that the lower court may articulate what materials and issues it considered, and why those materials did not raise material issues of fact. *See id.* (reversing and remanding for further development where the circuit court "committed reversible error by granting summary judgment without including sufficient findings of fact and conclusions of law in its… order showing that the deposition testimony of [various witnesses] was properly considered"); *see generally Nestor v. Bruce Hardwood Flooring, L.P.*, 206 W. Va. 453, 525 S.E.2d 334 (1999) (per curiam) (reversing and remanding where "the circuit court [was] vague concerning the evidence upon which it relied in reaching its decision.").

### 2. The Comparative Fault Statute

On remand, the lower court should also consider the possible effect, if any, of our comparative fault statute,[31] which states:

---

[31] Although Pennsylvania substantive law is controlling in this case, our comparative fault statute governs various procedural issues such as the timing and content of notices designating potentially culpable non-party entities for purposes of determining whether they may appear on the verdict form. *See Courtland Co., Inc. v. Union Carbide Corp.*, Civil Action Nos. 2:18-cv-01230 & 2:19-cv-00894, 2020 WL 7234281 (S.D. W. Va. Dec. 8, 2020) (memorandum opinion and order) (declining to strike defendant's notices because of its failure to comply with the timing and content requirements of W. Va. Code § 55-7-13d). Thus, we apply the procedural requirements of our comparative fault statute notwithstanding the choice of law paragraph in the AOS. *See generally State ex rel. Airsquid Ventures, Inc. v. Hummel*, 236 W. Va. 142, 778 S.E.2d 591 (2015) (a choice of law provision specifying which state's substantive law to apply does not and cannot prevent application of our procedural laws). "The procedural laws of this state necessarily apply to matters that are brought in the courts of West Virginia." *Id.* at 146, 778 S.E.2d at 595.

In assessing percentages of fault under West Virginia Code § 55-7-13d (2016), the trier of fact must consider the fault of all persons who contributed to the alleged damages regardless of whether immunity or some other principle of law would prevent such a person from being named as a party to the suit. Fault of a nonparty shall be considered if the plaintiff entered into a settlement agreement with the nonparty or if a defending party gives notice no later than one hundred eighty days after service of process upon said defendant that a nonparty was wholly or partially at fault. W. Va. Code § 55-7-13d(a)(1) and (2).

Syl. Pt. 2, *State ex rel. March-Westin Co. v. Gaujot*, 247 W. Va. 283, 879 S.E.2d 770 (2022).

In this case, the respondents did not identify any non-parties they thought might be at fault pursuant to our comparative fault statute.[32] Consequently, those non-parties cannot appear on the verdict form unless IPI and/or Mr. Taylor settled with them,[33] but the record on appeal does not indicate whether there might have been such a settlement.

---

[32] Although respondents did not designate any culpable non-parties pursuant to our comparative fault statute or identify any experts to opine that the non-parties were at fault, they argue on appeal that three service providers were responsible for the leak: AllTranstek, LLC (a company which provided railcar maintenance services for the respondents), Rescar (a company which repaired and inspected the defective railcar before the leak), and Superheat GFH Service, Inc. (a company which performed specialized post weld treatments at areas adjacent to or in proximity to the crack).

[33] In *State ex rel. AmerisourceBergen Drug Corp. v. Moats*, 245 W. Va. 431, 859 S.E.2d 374 (2021), Justice Hutchison took the position in his concurring opinion that it was also necessary to make a good faith effort to sue potentially culpable entities before they could be considered as "non-parties" for purposes of W. Va. Code § 55-7-13d.

Other than Axiall, Eagle Natrium, and the service providers (who were not designated by respondents), the only parties in this case who might be at fault, and therefore appear on the verdict form, would be IPI and Mr. Taylor. Under our comparative fault statute, "[t]he burden of . . . proving comparative fault shall be upon the person who seeks to establish such fault." W. Va. Code § 55-7-13d(d).[34] Our record on appeal contains no evidence that either Mr. Taylor or IPI were at fault in any way. Indeed, the deposition testimony of Mr. Linder, one of the defendants' 30 (b) (7) designees, indicated that the respondents were not blaming IPI or Mr. Taylor for causing the chlorine leak. During oral argument, counsel for Axiall and Eagle Natrium did not identify any evidence that his clients had submitted in the lower court to show that they were not solely negligent, i.e.,

> Furthermore, West Virginia Code § 55-7-13d is clear that in order for an entity to be a "non-party" in a negligence action, the actual parties must first make a bona fide attempt to sue and serve those entities and so try (but fail) to make them actual parties to the suit. To read the statute otherwise is to invite every defendant in every civil suit to flail about, blaming strangers for harms caused by the defendant without giving the stranger an opportunity to defend his or her reputation. To paraphrase the cliché, spaghetti will be thrown at strangers with hope that it sticks.

245 W. Va. at 453, 859 S.E.2d at 396. We need not address this issue because it was not raised by the parties and is unnecessary to our decision.

[34] This statutory provision is consistent with the general rule recognized in our caselaw that the party asserting negligence on the part of another has the burden of proof. *See Addair v. Bryant*, 168 W. Va. 306, 312 n. 3, 284 S.E.2d 374, 378 n.3 (1981) ("It should be noted that *Bradley v. Appalachian Power Company*, W. Va., 256 S.E.2d 879 (1979), which set the rule of comparative negligence, did not purport to change the defendant's burden of proof for contributory negligence.").

43

that there were any other culpable entities. It is very possible that IPI and Mr. Taylor would not even appear on the verdict form, or that if they did, the jury would not find any negligence on their part which proximately contributed to their injuries.

W. Va. Code § 55-7-13a (c) (2015) provides that: "The total of the percentages of comparative fault allocated by the trier of fact with respect to a particular incident or injury must equal either zero percent or one hundred percent." If the respondents are the only parties on the verdict form, then their collective fault will either equal zero or one hundred percent. If it equals one hundred percent, then they will not be entitled to indemnification because the verdict will have determined that they were solely at fault. Similarly, if IPI and Mr. Taylor do appear on the verdict form, but the jury finds no negligence on their part, then the defendants will be solely at fault, and therefore not entitled to indemnification. *See Dalton v. Childress Serv. Corp*., 189 W. Va. 428, 432, 432 S.E.2d 98, 102 (1993). Consequently, on remand, the lower court should address the effect, if any, of our comparative fault statute as it may relate to summary judgment.

### 3. Burden of Proof

In determining whether there are material questions of fact concerning sole negligence, gross negligence, and willful misconduct, the lower court must consider which party has the burden of proof on these issues. *See generally Williams v. Precision Coil,*

*Inc.*, 194 W. Va. 52, 62 n.17, 459 S.E.2d 329, 339 n. 17 (1995) (In deciding a motion for summary judgment, "it is necessary for a circuit court to give appropriate consideration to the allocation of burden of proof at trial."). "A misallocation of the burden of proof can invalidate a grant of summary judgment if…the basis for the grant was that the other party had the burden of proof but had failed to present any evidence." Louis J. Palmer & Robin Jean Davis, *Litigation Handbook on West Virginia Rules of Civil Procedure* at 1312 (5th ed. 2017); s*ee generally* 73 Am. Jur. 2d *Summary Judgment* § 17 Westlaw (database updated October 2023) (if a moving party fails to meet its burden of proof, the nonmovant is not required to present any evidence to survive a motion for summary judgment).

As a general rule, the party asserting a claim for indemnification has the burden of proving that it is entitled to indemnification. *Diepietro v. City of Philadelphia*, 496 A.2d 407, 410 (Pa. Super. Ct. 1985); *Topp Copy Products, Inc. v. Singletary*, 626 A.2d 98, 103 (Pa. 1993) (Montemuro, J., dissenting). Specifically, the party seeking indemnity has the burden of proving "the scope of the indemnification agreement, the nature of the underlying claim, [and] its coverage by the indemnification agreement." *Burlington Coat Factory of Pennsylvania, LLC v. Grace Const. Management Co., LLC*, 126 A.3d 1010, 1022 (Pa. Super. Ct. 2015); *McClure v. Deerland Corp.*, 585 A.2d 19, 22 (Pa. Super. Ct. 1991). Thus, in this case, the respondents would have the burden of proving that the personal injury and property damage claims for which it seeks indemnification "arose from" the work performed by IPI.

This raises the question of which party has the burden of proving that the respondents were (or were not) guilty of sole negligence, willful misconduct, or gross negligence (if applicable). This, in turn, depends on whether the absence of sole negligence, willful misconduct, or gross negligence are conditions necessary for indemnification, or the presence of such conduct is an exclusion from the duty to indemnify. If the absence of sole negligence, willful misconduct, or gross negligence were necessary conditions for indemnity, then the respondents would have the burden of proof on that issue. If the existence of sole negligence, willful misconduct, or gross negligence is an exclusion or an affirmative defense, then IPI would have the burden of proof.

Courts in other jurisdictions have frequently held that exclusions in indemnity contracts such as sole negligence, gross negligence, and willful misconduct are affirmative defenses on which the indemnitor bears the burden of proof. *See XL Specialty Insur. Co. v. Kiewit Offshore Servs., Ltd.*, 426 F. Supp. 2d 565, 574-75 (S.D. Tex. 2006) (sole negligence, gross negligence, and contributory negligence were affirmative defenses); *Grubb & Ellis Management Servs., Inc. v. 407417, B.C., LLC*, 138 P.3d 1210, 1215-1216 (Ariz. 2006) (gross negligence was an affirmative defense); *Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.*, 106 S.W.3d 118, 126 (Tex. Ct. App. 2002) (indemnitor's assertion that indemnification was precluded because of a contractual exclusion for gross negligence and willful misconduct was an affirmative defense); *see*

46

*generally Branch Banking and Trust Co. v. Syntellect, Inc.*, Civil Action No. 2:08cv955-MHT, 2010 WL 2947772, at *6 (M.D. Ala. July 22, 2010) ("a contractual exception or limitation to an indemnity provision 'is in the nature of an affirmative defense.'"); *Allied-Signal , Inc. v. Acme Serv. Corp.*, No. S88-449 (RLM), 1992 WL 165816, at * 5 (N.D. Ind. May 8, 1992) ("under Indiana law, the indemnitee must prove that he is entitled to indemnification under terms of the contract while an exception to a claim of indemnity is an affirmative defense which must be raised and proven by the indemnitor."); *N. Little Rock Elec. Co. v. Pickens-Bond Constr. Co.*, 485 S.W.2d 197, 199 (Ark. 1972) (stating that indemnitee's assertion that claim was excluded by the indemnity agreement is an affirmative defense on which indemnitor bears burden of proof).

Consistent with these cases, we hold that IPI bears the burden of proof on sole negligence, gross negligence, and willful misconduct. *See generally State ex rel. Zirkle v. Fox*, 203 W. Va. 668, 672, 510 S.E.2d 502, 506 (1998) (defendants bear the burden of proof on affirmative defenses); *Williams v. Precision Coil, Inc.*, 194 W. Va. 52, 62 n.17, 459 S.E.2d 329, 339 n. 17 (1995) (same).

### 4. Gross Negligence

Although the lower court examined whether there was a genuine issue of material fact as to whether the respondents had been either solely negligent or guilty of

willful misconduct, it did not address whether there was a triable issue concerning the allegations that respondents had been grossly negligent. The conclusion that the applicable indemnity language covered injuries resulting from mere negligence on the part of the respondents should not have been the end of the lower court's analysis because the parties also briefed and argued the issue of whether IPI was required to indemnify the respondents regarding claims related to their gross negligence.

Relying on *Ratti v. Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695 (Pa. Super. Ct. 2000), IPI contended that Pennsylvania law does not allow a party to be indemnified for its own gross negligence unless it is clearly manifested in the contract language. Relying on definitions of "negligence" and "misconduct" from Black's Law Dictionary, Axiall and Eagle Natrium argued in the lower court that "gross negligence" was synonymous with "willful misconduct," and therefore, it was covered by the contract language covering willful misconduct. They also argued that, in any event, there was no evidence to show that they had been "grossly negligent."

Because the issue of whether the respondents were entitled to indemnification for gross (rather than ordinary) negligence was not addressed or resolved by the lower court, we will not decide it on appeal. *See Smoot ex rel. Smoot v. American Elec. Power*, 222 W. Va. 735, 737 n. 6, 671 S.E.2d 740, 742 n. 6 (2008) (per curiam); *Miralles v. Snoderly*, 216 W. Va. 91, 602 S.E.2d 534 (2004) (per curiam); *Keesecker v.*

48

*Bird*, 200 W. Va. 667, 490 S.E.2d 754 (1997). Instead, we remand this question to the lower court for resolution. Should it decide that the indemnification language covers gross negligence, it will need to decide whether indemnification for gross negligence violates the public policy of West Virginia. If not, then it will need to decide whether there is a genuine issue of material fact concerning the allegations of gross negligence.

This is not an academic exercise because the Respondents could be grossly negligent even if they were not solely negligent. Furthermore, they could be grossly negligent even if they were not guilty of willful misconduct because grossly negligent conduct is less egregious than willful misconduct. *Ratti v. Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695, 703 (Pa. Super. Ct. 2000); *Mandolidis v. Elkins Indus., Inc*., 161 W. Va. 695, 705, 246 S.E.2d 907, 913-14 (1978). If the AOS does not require indemnification for gross negligence, there could be a genuine issue of material fact concerning the existence of gross negligence even if the issues of sole negligence and willfulness were proper for summary judgment.

## IV.  CONCLUSION

For the aforementioned reasons, we affirm the lower court insofar as it determined that IPI was subject to binding and enforceable indemnity agreements, that such agreements were governed by Pennsylvania law, and that the indemnity language of the AOS was sufficiently clear and unequivocal to permit indemnification for at least some

49

degree of negligence on the part of the respondents. However, we vacate and remand this case so that the lower court may more adequately consider and develop its ruling on the scope of the applicable indemnity provision, in particular the nexus required for indemnification and its application to the facts of this case.

If the court decides that the indemnity provisions do not apply because there is an insufficient nexus between the work being performed by IPI and the injuries and losses which resulted from the chlorine leak, then it need not address whether there were genuine issues of material fact pertaining to sole negligence, gross negligence, or willful misconduct. If the lower court does address these factual issues, however, it should take into account the ability to authenticate documents without affidavits; the effect, if any, of our comparative fault statute; and the burden of proof. Depending on how it rules on other issues, it may also be necessary for the lower court to rule on the admissibility of the NTSB accident report under 49 U.S.C. § 1154 (b) (2018) and 49 C.F.R. § 835.2 (1999).

Affirmed in part, Vacated in part, and Remanded.